# STATE OF MICHIGAN

# COURT OF APPEALS

---

BENTLEY TERRACE DILLARD, as Trustee of
the BENTLEY TERRACE DILLARD FAMILY
TRUST,

        Plaintiff-Appellant,

v

MARK E. SCHLUSSEL, ROSE LYNN
SCHLUSSEL, M & A CONSULTING, L.L.C.,
f/k/a M & A ENTERPRISES, L.L.C., and
SCHLUSSEL & SCHEFMAN, P.L.L.C.,

        Defendants-Appellees.

UNPUBLISHED
October 21, 2014

No. 315485
Oakland Circuit Court
LC No. 2011-119976-PR

---

Before: BECKERING, P.J., and HOEKSTRA and GLEICHER, JJ.

PER CURIAM.

This action brought under the Michigan Uniform Fraudulent Transfer Act (MUFTA), MCL 566.31 *et seq.*, presents two legal questions. The first concerns the applicable statute of limitations. We affirm the circuit court's ruling that MUFTA's six-year limitations period bars plaintiff Bentley Terrance Dillard's fraudulent transfer claims arising before June 23, 2005. The second issue is whether a debtor's transfer of assets for the purpose of paying the debtor's ordinary household expenses immunizes the transfers from challenge under the MUFTA. We hold that it does not, and reverse the circuit court's contrary ruling.

## I. BACKGROUND FACTS AND PROCEEDINGS

Bentley Terrace Dillard holds a substantial judgment against defendant Mark E. Schlussel (Mark), a Michigan attorney. Mark's debt stems from his failed investment in A Little More Red, an Arizona limited liability company formed in 2002. Mark and Dillard funded the company with a $500,000 line of credit, for which both pledged personal guarantees. True to its name, however, A Little More Red consistently leaked cash. During 2003 and 2004, Mark personally contributed $206,936.83 to keep the enterprise afloat. A Little More Red closed its doors at the end of 2004. Dillard paid off the entire line of credit and sued Mark for his share. In November 2008, a jury found in Dillard's favor and judgment entered against Mark. The Arizona Court of Appeals affirmed. *Dillard v Schlussel*, unpublished opinion per curiam of the Arizona Court of Appeals, issued May 10, 2011 (Docket No. 1 CA-CV 10-0219). In May 2009,

-1-

the Oakland Circuit Court domesticated the Arizona judgment, which by then exceeded $500,000.

In March 2010, Mark sat for a creditor's examination. Relevant to the issues presented here, Mark testified that until March 2004, he owned a company called M & A Enterprises. Mark explained that "M & A Enterprises was a consulting company that I had[,] I was receiving salary, that company was the company that employed me . . . when I rendered services to Detroit Medical Center." Mark's counsel explained in a subsequent letter written to Dillard's attorney that "while M & A did receive deposits, it had no assets, nor contracts, nor receivables; it was essentially a receptacle for whatever Mr. Schlussel could gather together to invest." In support of his application for A Little More Red's line of credit, Mark valued M & A at $100,000.

In March 2004, Mark conveyed M & A to his wife, defendant Rose Lynn Schlussel (Rose Lynn).[1] Mark received no consideration from his wife for this transfer. Temporally, the transfer coincided with the period of A Little More Red's financial decline. By March 2004, A Little More Red had exhausted its line of credit and Schlussel had loaned the company more than $175,000.

During his continued creditor's exam in April 2010, Mark produced his tax returns for the years 2004 through 2008. The returns stated sizeable adjusted gross incomes for each year: $496,228 in 2004, $850,713 in 2005; $354,921 in 2006, $348,877 in 2007, and $427,959 in 2008. Mark claimed that none of the post-tax income earned during this five-year period remained available for collection because the Schlussels had spent it all.

Mark testified that his wife paid the couple's monthly expenses, which averaged approximately $18,000, with "[m]oney in her [personal] checking account." When asked where his wife got the money to pay the bills, Mark responded:

> *Q*. Do you pay any portion of the household bills?
>
> *A*. No.
>
> *Q*. What is the source of the money in her checking account?
>
> *A*. Various sources.
>
> *Q*. Does any of the money on a regular basis come from you?
>
> *A*. I don't understand the question.

---

[1] During the creditor's exam, Mark recalled that he transferred M & A to his wife in 2004, but could not recall the date. He later produced the assignment document setting forth the exact date of the transfer.

*Q*. Fair enough. You said that your wife pays your household expenses out of a checking account that's in her name, is that correct?

*A*. Correct.

*Q*. What I'm looking to find out is where does the money in her checking account come from, do you regularly deposit money in there, do you irregularly deposit money in there, does she have some different sources of money that she uses for her checking account, that's what I'm trying to find out[.]

*A*. She has personal sources of money and of late . . . the money has come from my pension.

*Q*. You take money out of your pension and put it in the checking account?

*A*. Correct.

Dillard's counsel specifically inquired whether other "sources of funds" may have enhanced accounts owned by Rose Lynn, but was met with an objection and Mark's refusal to answer:

*Q*. Besides your wife's checking account that I understand you are not going to give me any details about, are there any other accounts of any kind that are held in your wife's name into which you have deposited money since November of 2004? And by that I mean, is there an investment account? Is there some other kind of account, other than this checking account that we have been discussing?

*A*. Not to the best of my recollection.

*Q*. Understanding that I am going to get an objection from your counsel, what are the other sources of funds that are in your wife's checking account?

*Mr. Lippitt*: Objection. Don't answer the question, unless they come from you.

*Mr. Plunkett*: And when I said other, I meant other than you.

*Mr. Lippitt*: Don't answer the question.

*Mr. Plunkett:* And you are taking that instruction?

*A*. Absolutely.

*Q*. Do you have authority to sign checks on your wife's checking account?

*A*. No.

Dillard filed this MUFTA action on June 23, 2011. Her first amended complaint avers that despite Mark's successful law practice and "substantial income," she had "been able to locate only approximately $2,000 in his accounts at various financial institutions and . . . collected an additional approximately $5,000 through other collection efforts." The first amended complaint alleges that beginning in 2004, and continuing through 2009, Mark transferred large amounts of money to M & A accounts held by Rose Lynn. These transfers, the complaint asserted, were fraudulent. The first amended complaint further states that Mark fraudulently transferred the cash value of a Pacific Life insurance policy to Rose Lynn. Defendants' affirmative defenses to the first amended complaint included an allegation that Dillard's claims "are barred as any and all funds alleged to have constituted fraudulent transfers were used for customary living expenses."

Rose Lynn was deposed in March 2011. By then, Dillard had obtained some discovery regarding Rose Lynn's personally-held accounts. Between November 2010 and March 2011, one such account received $26,000 in deposits from Mark. Rose Lynn explained, "It is my account and it's an account that I did receive funds from Mark that I did pay some of our living expenses from."[2] Additionally, M & A was "receiving funds for a consulting fee that Mark was doing for a company in California. . . ."

According to Rose Lynn, Mark stopped depositing his law firm draw checks into his checking account in 2010, after Dillard garnished that account. Instead, he endorsed checks made out to him to Rose Lynn. She then deposited the checks into her personal account, or accounts held by M & A:

> *Q.* Did you ever ask why all of a sudden he started giving you his law firm checks for deposit into your account?
>
> *A.* No.
>
> *Q.* When Mark - - I'll take as an example the first check on here. It's a check dated March 1st, 2010 from Schlussel and Schefman, PLLC to Mark in the amount of 12 thousand 500 dollars that you deposited into your Comerica account on March 2nd, 2010, correct?
>
> *A.* Correct.
>
> *Q.* And when Mark gave you this check to deposit into your Comerica account, did you give him anything in return or did you just take the check and put it in your account?
>
> *A.* I just take the check and put in my account.

---

[2] On instruction from counsel, Rose Lynn refused to identify the location of this account. Counsel indicated that he did not want the account garnished as the funds it held "were never Mark's funds and they are funds that are required to live on."

*Q.* Did you segregate that money in any way or did you just put it into the account with the rest of the money?

*A.* To my recollection I just put it in my account.

*Q.* And I take it that it would, but would that answer be the same for the rest of the checks? Both the answers I guess, one, that you didn't give him anything in return, correct?

*A.* Correct.

Rose Lynn admitted that beginning in 2004, and continuing through 2010, she wrote $647,000 worth of checks to herself drawn on M & A accounts. The source of this money was Mark's law firm earnings. After depositing Mark's earnings in an M & A account, Rose Lynn wrote checks to herself or to Mark. According to a summary prepared by Dillard's counsel, between 2005 and 2007, Rose Lynn transferred $125,000 back to Mark using M & A as the conduit. Dillard contends that from 2004 through 2009, Rose Lynn deposited approximately $740,000 of Mark's law firm earnings into one account and an even greater amount (approximately $800,000) into another account, both held by M & A. Virtually all of that money was eventually distributed from the M & A accounts to Mark or Rose Lynn.[3] Notably, defendants have not contested the amounts or the mechanism of these transfers.

The parties agree that during this time, M & A had no income other than Mark's consulting fees. The company performed no separate work, had no employees, and incurred no expenses. Rose Lynn gave no consideration for any of the checks endorsed to her. According to defendants, Rose Lynn used all of the transferred money to pay the couple's substantial living expenses.

Dillard also unearthed evidence regarding the transfer of cash from a Pacific Life variable universal life insurance policy. The policy was owned by an entity called the M & A Enterprises LLC Defined Benefit Plan & Trust. Shortly before Mark's initial creditor's exam, the policy had a cash surrender value of approximately $50,000. Shortly after the creditor's exam, Mark obtained a $40,000 loan from the policy. Pacific Life made the check payable to the M & A Enterprises LLC Defined Benefit Plan & Trust. Mark requested reissuance of the check to Rose Lynn. Mark subsequently transferred the policy's ownership to his wife.[4]

---

[3] In August 2011, the circuit court entered an order garnishing 25% of Mark's law firm earnings.

[4] Evidence also revealed that Mark transferred $228,000 from an investment account he held at SEI into Rose Lynn's personal checking account. After noting the existence of this transfer in her appellate brief, Dillard provides no explanation of why the circuit court should not have treated these funds as beyond a judgment creditor's reach. Accordingly, we deem waived any appellate challenge in this regard. *Lawrence v Will Darrah & Assocs, Inc*, 445 Mich 1, 5 n 2; 516 NW2d 43 (1994).

Defendants moved for summary disposition under MCR 2.116(C)(7), arguing that transfers made prior to June 23, 2005, were barred by the statute of limitations set forth in MCL 566.39.[5] Dillard conceded that the statute prescribes a six-year limitations period, but argued that the Schlussels had fraudulently concealed the transfers, triggering the application of MCL 600.5855:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Defendants additionally sought summary disposition under MCR 2.116(C)(10) regarding the transfers falling within the statute of limitations, contending that Mark received "reasonably equivalent value" for the transfers in the form of his wife's payment of living and household expenses. According to defendants, the Schlussels' use of the money to pay their ordinary household expenses eliminates any claim under the MUFTA. Further, defendants argued, the loan of $40,000 from the Pacific Life insurance policy was "proper as a matter of law" and did not constitute a fraudulent transfer.

In support of defendants' motion for summary disposition, Rose Lynn submitted an affidavit averring that she always wrote the checks for the couple's household bills, and that "[f]or the last 25 years, our ordinary and customary living expenses, on an annual basis, have been in the range of $250,000-$275,000 per year." Rose Lynn admitted that she sometimes used her "own funds" to pay the expenses, and that when she did so, she "would repay [her]self from the monies Mark provided to [her] for this purpose when they became available."

---

[5] In relevant part, MCL 566.39 provides:

> A cause of action with respect to a fraudulent transfer or obligation under this act is extinguished unless action is brought under 1 or more of the following:
>
> (a) [MCL 566.34(1)(a) and (b) and MCL 566.35(1)], within the time period specified in . . . MCL 600.5813 and 600.5855.

MCL 600.5813 provides:

> All other personal actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a different period is stated in the statutes.

The circuit court first addressed the applicable statute of limitations. The court found that the MUFTA "allows the discovery rule to extend the statute of limitations" if "defendant . . . actively concealed the fraudulent transfer." The circuit court determined:

> There is nothing to suggest Rose [Lynn] was actively involved in the allegedly fraudulent transfer other than as the recipient. The substantively admissible evidence submitted in response to the instant motion does not demonstrate Rose [Lynn] was actively involved in concealing the transfer. Therefore, the period of limitations was not extended as to Rose and the claim is properly dismissed as barred by the statue of limitations as to Rose relating to the transfer of M & A.

Because Dillard's complaint was filed on June 23, 2011, claims based on transfers that occurred more than six years before that date were barred.

The court then granted summary disposition regarding the remaining transfers, premising its opinion on *United States v Goforth*, 465 F3d 730 (CA 6, 2006). According to the court, that case stands for the proposition that funds transferred from Mark to Rose Lynn "are exempt from the MUFTA claims" because they "were used to pay household expenses." The court ruled: "The undisputed substantively admissible evidence supplied in this case demonstrates Rose used the funds, including those funds initially transferred by Mark to the corporate entity, to pay reasonable and ordinary household expenses."

The court also granted summary disposition of Dillard's claims relative to the Pacific Life policy, finding that because Mark did not own the policy when the loan was made, he bore no liability under the MUFTA arising from the transfer.

## II. THE STATUTE OF LIMITATIONS

We first consider whether the statute of limitations bars Dillard's MUFTA claims involving transfers made more than six years before Dillard filed her complaint. Dillard argues that the discovery tolling provision embodied in MCL 600.5855 extends the statue of limitations for an additional two years, because one or more defendants fraudulently concealed the existence of the transfers. We reject this argument for the simple reason that evidence of the transfers was available —and revealed —during the limitations period. In other words, no evidence supports fraudulent concealment.

Summary disposition may be granted under MCR 2.116(C)(7) when a claim is barred by the statute of limitations. We review de novo both a circuit court's decision regarding a motion for summary disposition pursuant to MCR 2.116(C)(7) and questions of law. *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013).

> When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them. If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact. If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the

court. However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate. [*Dextrom v Wexford Co*, 287 Mich App 406, 428-429; 789 NW2d 211 (2010) (citations omitted).]

Absent a fiduciary relationship, fraudulent concealment extends the applicable limitations period only when the defendant has made an affirmative act or representation. "The plaintiff must show that the defendant engaged in some arrangement or contrivance of an affirmative character designed to prevent subsequent discovery." *The Meyer & Anna Prentis Family Foundation, Inc v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 48; 698 NW2d 900 (2005) (quotation marks and citation omitted). Mere silence does not demonstrate fraudulent concealment and, "[i]f liability were discoverable from the outset, then MCL 600.5855 will not toll the applicable period of limitations." *Id.* (quotation marks and citation omitted).

Dillard filed this action on June 23, 2011. Her complaint encompasses the March 2004 transfer of M & A to Rose Lynn, and all subsequent transfers made to Rose Lynn and M & A. However, the record belies any concealment of the transfer of M & A, or of any of the other transfers. Dillard domesticated the Arizona judgment in May 2009, well within the six-year statute of limitations period, and began obtaining discovery shortly thereafter. Dillard knew of M & A's existence when she and Mark applied for the ill-fated line of credit. Mark was not deposed until March 2010. No evidence supports that Dillard lacked the ability to depose him earlier, or that defendants attempted to hide Mark's transfer of M & A during that interim. Mark admitted to the M & A transfer during his exam. And while Mark resisted sharing information regarding his wife's bank accounts, Dillard has brought forward no evidence substantiating that during the years after she obtained a judgment against Mark, she was *prevented* from learning that Mark had transferred the company to his wife, or that checks written to him had been deposited in M & A accounts. To the contrary, the information emerged during the regular course of discovery. Accordingly, the circuit court properly granted summary disposition relating to fraudulent transfer claims that arose more than six years before Dillard filed her MUFTA complaint.

## II. THE MUFTA CLAIMS

We now turn to the heart of Dillard's case on the merits: whether Mark and Rose Lynn fraudulently transferred assets in contravention of the MUFTA. Considerable record evidence supports that Mark transferred assets to Rose Lynn intending to hinder, delay or defraud Dillard's collection of her judgment, establishing an actually fraudulent transfer under MCL 566.34. The evidence further substantiates constructive fraud under MCL 566.35(1). That the Schlussels used the transferred funds to pay their personal "living" expenses does not defeat Dillard's MUFTA claims.

We review do novo issues involving statutory interpretation or the propriety of summary disposition. *Prins v Mich State Police*, 291 Mich App 586, 589; 805 NW2d 619 (2011). When considering a motion for summary disposition under MCR 2.116(C)(10), a court must view the evidence submitted in the light most favorable to the party opposing the motion. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "Summary disposition is appropriate

under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id.* A genuine issue of material fact exists when the evidence submitted "might permit inferences contrary to the facts asserted by the movant." *Opdyke Investment Co v Norris Grain Co*, 413 Mich 354, 360; 320 NW2d 836 (1982). When entertaining a summary disposition motion under subrule (C)(10), the court must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in favor of the nonmoving party, and refrain from making credibility determinations or weighing the evidence. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013).

Well-established principles also guide our statutory construction efforts. We begin by examining the specific statutory language under consideration, bearing in mind that

> [w]hen faced with questions of statutory interpretation, our obligation is to discern and give effect to the Legislature's intent as expressed in the words of the statute. We give the words of a statute their plain and ordinary meaning, looking outside the statute to ascertain the Legislature's intent only if the statutory language is ambiguous. Where the language is unambiguous, we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written. [*Pohutski v Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002).]

A brief overview of fraudulent transfer law helps place the statutory provisions in context. "The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated 'covinous and fraudulent' transfers designed 'to delay, hinder or defraud creditors and others.'" *BFP v Resolution Trust Corp*, 511 US 531, 540; 114 S Ct 1757; 128 L Ed 2d 556 (1994) (citation omitted). The Uniform Fraudulent Transfer Act codifies the common law.[6] The UFTA is "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." *BMG Music v Martinez*, 74 F3d 87, 89 (CA 5, 1996). The Supreme Court of Wisconsin has explained: "The Uniform Fraudulent Transfer Act reflects a strong desire to protect creditors and to allow for the smooth functioning of our credit-based society. It is a creditor-protection statute. Without such protection for creditors, 'creditors would generally be unwilling to assume the risk of the debtor's fraudulent transfers.'" *Badger State Bank v Taylor*, 2004 WI 128; 276 Wis 2d 312, 330; 688 NW2d 439 (2004) (citations omitted). Our Legislature enacted the MUFTA in 1998.

The MUFTA defines two species of fraudulent transfers. The first encompasses transfers made "[w]ith actual intent to hinder, delay, or defraud" a creditor and applies to transfers made either before or after the creditor's claim arose. MCL 566.34(1)(a). The second, commonly called "fraud in law" or constructive fraud, deems certain transactions fraudulent regardless of the creditor's ability to prove the debtor's actual intent. It applies only to transfers made after the creditor's claim arose. Three elements of proof are required: (1) that the creditor's claim arose before the transfer, (2) the debtor was insolvent or became insolvent as a result of the transfer,

---

[6] Section 10 of the MUFTA contemplates that "[u]nless in conflict" with UFTA's provisions, common-law principles "supplement the provisions of this act." MCL 566.40.

and (3) the debtor did not receive "reasonably equivalent value in exchange for the transfer[.]" MCL 566.35(1). Dillard's first amended complaint invoked both MCL 566.34(1)(a) and MCL 566.35(1). We turn to a closer examination of the statutory language governing each claim.

## A. ACTUAL INTENT

Dillard contends that when Mark transferred his law firm draw checks to his wife, he harbored an "actual intent to hinder, delay, or defraud" Dillard, evidenced by the couple's use of M & A as a receptacle for money that would otherwise be available in for Dillard's collection. The statutory language governing this claim provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in *either* of the following:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
>
> (*i*) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (*ii*) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due. [MCL 566.34(1) (emphasis added).]

Dillard relies on § 4(1)(a), asserting that Mark's transfers to Rose Lynn were made with "actual intent" to defraud Dillard as his judgment creditor.

Several important statutory definitions control our construction and application of this language. Under the MUFTA, Mark is the debtor, as he is "a person who is liable on a claim." MCL 566.31(f). The MUFTA defines a "transfer" to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." MCL 566.31(*l*). An asset is:

> property of a debtor, but the term does not include any of the following:
>
> (*i*) Property to the extent that it is encumbered by a valid lien.
>
> (*ii*) Property to the extent it is generally exempt under nonbankruptcy law.

(*iii*) An interest in property held by tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only 1 tenant. [MCL 566.31(b)].

Here, the "property" involved consists of Mark's earnings. This property was not encumbered by a valid lien or held by the entireties. Nor do Mark's law firm earnings qualify as wholly exempt under MCL 600.6023, which sets forth a lengthy list of "property of the debtor and the debtor's dependents . . . exempt from levy and sale under any execution." Rather, federal law exempts from garnishment 75% of a debtor's weekly disposable income. 15 USC 1673(a)(1). Finally, whether a conveyance was fraudulent is a question of fact and not one of law. MCL 566.224. We proceed to apply the plain language of the MUFTA's "actual intent" provision.

Under the framework set forth in § 4(1)(a), the debtor's state of mind in making a transfer determines whether a transfer qualifies as made with an actually fraudulent intent. But debtors rarely admit to having deliberately placed assets out of the reach of their creditors. In *BFP*, the United States Supreme Court explained that to facilitate proof of such intent,

> English courts . . . developed the doctrine of "badges of fraud": proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent. [*BFP*, 511 US at 540-541.]

"Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." *In Re Triple S Restaurants, Inc*, 422 F3d 405, 414 (CA 6, 2005) (quotation marks and citation omitted). Our Supreme Court has approved the following description of the badges of fraud:

> Badges of fraud are not conclusive, but are more or less strong or weak according to their nature and the number concurring in the same case, and may be overcome by evidence establishing the bona fides of the transaction. However, a concurrence of several badges will always make out a strong case. [*Bentley v Caille*, 289 Mich 74, 78; 286 NW 163 (1939) (quotation marks and citation omitted).]

In § 4(2), the MUFTA sets forth a nonexclusive list of 11 factors that may be considered in determining a debtor's actual intent in making a transfer:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. [MCL 566.34(2).]

These factors correspond to the historical badges of fraud. "In determining actual intent under subsection (1)(a)," the statute instructs, "consideration may be given, among other factors, to whether 1 or more" of the factors occurred. MCL 566.34(2). Here, the confluence of several factors supports a strong inference of fraud.

Factor (a) creates an inference of fraudulent intent when a transfer is made to an insider. The MUFTA defines a spouse as an "insider." MCL 566.31(1)(g) and (k). "A classic example of such transfers is a debtor spouse subject to a money judgment who 'buries' the titles to the house, car, stocks, bank accounts, and other assets in the other spouse's name." Sullivan, *Future Creditors and Fraudulent Transfers: When A Claimant Doesn't Have A Claim, When A Transfer Isn't A Transfer, When Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 Del J Corp L 955, 961 (1997). Mr. Sullivan continues: "The obvious and transparent intent behind this ploy is to leave the judgment debtor with no assets in order to frustrate the creditor's collection efforts, while still allowing the debtor to retain the control, benefit, and use of the assets through the auspices of his or her spouse." *Id.*

Mark endorsed his law firm checks to an insider, who then deposited them in accounts owned by M & A, a company wholly owned by an insider. These transfers benefitted the Schlussels personally, while impairing Dillard's ability to collect her judgment. The evidence satisfies this badge of fraud.[7]

---

[7] Our Supreme Court has long recognized that intrafamily transfers raise particular suspicions of fraud: "As a general rule transactions between members of a family must be closely scrutinized when the rights of creditors are involved and when such transactions are accompanied by other badges of fraud, a full explanation of the conveyance is required when it is challenged by an

Factor (b) is satisfied by evidence that "[t]he debtor retained possession or control of the property transferred after the transfer." MCL 566.34(2)(b). Rose Lynn admitted to having written checks to Mark from the M & A account. Thus, Mark retained control of some of the money transferred to his wife, and then to M & A. "No effort to hinder or delay creditors is more severely condemned by the law than an attempt by a debtor to place his property where he can still enjoy it and at the same time require his creditors to remain unsatisfied." *Bentley*, 289 Mich at 78. Though expressed well before our Legislature's enactment of the MUFTA, this sentiment resonates here and gives rise to a second badge of fraud.

The third factor, MCL 566.34(2)(c), applies when "[t]he transfer was . . . concealed." By positioning Rose Lynn as the legal owner of M & A, Mark could conceal from Dillard the transfers of his law firm checks deposited into M & A accounts. According to the Schlussels' testimony, this routing scheme was hatched precisely because Mark's bank accounts had been or were subject to garnishment.

Dillard filed the Arizona suit in 2005; consequently, evidence supports the fourth factor, which provides that "[b]efore the transfer was made . . . the debtor had been sued or threatened with suit." MCL 566.34(2)(d). Viewing the evidence in the light most favorable to Dillard, Mark's debt arose even earlier than that.

Virtually every penny Mark earned was transferred to his wife, satisfying the fifth factor: "The transfer was of substantially all of the debtor's assets," MCL 566.34(2)(e).

Mark's conveyance of M & A Consulting to Rose Lynn for no value, followed by the couple's use of the corporation's bank account as the depository for Mark's earnings, substantiates that "[t]he debtor removed or concealed assets," satisfying MCL 566.34(2)(g), the sixth badge of fraud. While we acknowledge that the conveyance occurred outside the statute of limitations "look-back" period, the Schlussels' employment of M & A as a conduit for cash both before and after the Arizona judgment evidences Mark's intent to hinder or delay Dillard's collection efforts.

MCL 566.34(2)(h) asks whether "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." Mark received no value for transferring his checks to Rose Lynn or for depositing them in the M & A accounts. For the reasons discussed below, the "household expense" defense does not defeat this badge of fraud. But even assuming the transfers were intended as reasonably equivalent value in the form of payment for living expenses, eliminating this single badge of fraud does not erase the other badges of fraud or the otherwise well-supported inference that Mark devised the M & A deposit scheme to hinder, delay or defraud Dillard.

Mark has admitted to being insolvent at the time Dillard demanded payment of the guaranty, thus satisfying MCL 566.34(2)(i) ("[t]he debtor was insolvent or became insolvent

---

unsatisfied creditor." *Farrell v Paulus*, 309 Mich 441, 450; 15 NW2d 700 (1944) (quotation marks and citation omitted).

shortly after the transfer was incurred") and (j) ("[t]he transfer occurred shortly before or shortly after a substantial debt was incurred").

Accordingly, the evidence supports the existence of at least seven of the 11 factors that give rise to an inference of actual intent to defraud. These strands of direct and circumstantial evidence give rise to a prima facie case under MCL 566.34(1)(a). When Mark made most of the transfers, his financial situation was precarious at best, and dreadful at worst. As of late 2004, his $250,000 share of the guaranty had been called and he apparently lacked the cash to pay it. In October 2005, Dillard filed suit, and by November 2008, a large judgment had entered against him. Beginning in March 2004, and continuing until some point in 2011, Mark purposefully endorsed all of his law firm earnings checks to an insider for no consideration. The insider deposited the checks in accounts controlled only by the insider and which did not bear Mark's name. The Schlussels admitted to using the money for other expenses (in other words, to preferentially pay *other* creditors), and deliberately sheltering it from Dillard's collection. This evidence supports that Mark intended to "hinder, delay, or defraud" Dillard.

Defendants raise a single defense to Dillard's § 4(1)(a) case: Mark transferred his earnings to Rose Lynn, who then transferred them to M & A, as a mechanism for paying their ordinary household expenses. According to an affidavit signed by Rose Lynn, the sum ultimately expended on household expenses was "reasonable." The trial court found that this defense nullified Dillard's claim under § 4(1)(a).[8]

Three fundamental legal errors undercut the circuit court's ruling. First, once a creditor establishes the presence of multiple badges of fraud, he or she has established a fact question regarding actual intent. Second, by ignoring the factors supporting Mark's actual intent to fraudulently transfer his earnings and instead crediting the Schlussels' claim that they merely intended to pay expenses rather than to hinder Dillard's collection efforts, the circuit court invaded the province of the fact finder.[9] Third, "reasonably equivalent value" received by a

---

[8] Mark also asserts that he transferred M & A to his wife for "estate planning purposes," thereby negating any fraud. Record evidence substantiates that the transfer was made for estate *preservation*, as are most fraudulent transfers to insiders. To the extent that one's intent to keep one's money corresponds with "estate planning," the fact finder may decide to credit Mark's contention. Nevertheless, the transfer bears many indicia of actual fraud, and these indicia are not cleansed by Mark's claim that he was merely planning his "estate." Mark admitted as much during his creditor's exam when he offered that he transferred M & A to his wife for "[e]state planning purposes, I wanted to get things in her name, not my name." Whether placing a straw corporation regularly drained of assets in Rose Lynn's name was accomplished for purposes unrelated to hindering, delaying or defrauding Dillard is for the fact finder to determine.

[9] Even were it relevant, the "reasonableness" of the Schlussels' expenses also constitutes a question of fact. Simply put, whether the hundreds of thousands of dollars that flowed from Mark into the M & A Consulting account represented an amount *reasonably* necessary for the Schlussels' support represents a question of fact. That the Schlussels "ordinarily" spent $250,000 - $275,000 per year on themselves does not mean that this sum was "reasonable."

-14-

transferee is not a defense to a claim brought under § 4(1)(a). Receipt of "reasonably equivalent value" may present an obstacle to *avoidance* of transfers challenged under § 4(1)(a), but it does not cleanse the transfers of their fraud. In other words, the consideration exchanged for an intentionally fraudulent transfer may limit the creditor's *remedy*, but it does not negate the fraudulent transfer claim itself.[10] "[T]he determination that the transfer is fraudulent is conceptually distinct from the avoidance of the transfer, which is, in turn, separate and distinct from a recovery based upon the avoidance of a transfer." *In re Cohen*, 199 BR 709, 716 (CA 9, 1996). And here, Rose Lynn exchanged *no* value for the transfers, completely defeating defendants' argument.

The plain text of MCL 566.34(1) ascribes relevancy to "reasonably equivalent value in exchange of the transfer" only as to claims brought under § 4(1)(b), and not under § 4(1)(a). "Unlike constructively fraudulent transfers, the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent." *Cohen*, 199 BR at 717. The South Dakota Supreme Court has clarified this point:

> The role of "reasonably equivalent value" in actual fraudulent intent as compared to constructive fraud is not the same although the meaning of the phrase is the same. In the context of actual fraud, the absence of reasonably equivalent value is only one of the badges of fraud that courts consider in determining whether a transfer was made with fraudulent intent. Its existence is not an absolute defense when other badges exist. Thus, several badges of fraud could overcome a finding that reasonably equivalent value was given when actual fraud is considered. [*Glimcher Supermall Venture, LLC v Coleman Co*, 2007 SD 98; 739 NW2d 815, 823 (2007).]

Rather, MCL 566.38(1) provides that "[a] transfer . . . is not voidable under section 4(1)(a) against a person who took in good faith and for a reasonably equivalent value. . . ." In other words, transferees who have exchanged "reasonably equivalent value" for a transfer are protected from the avoidance remedy—they can keep that which they paid for. This makes good

_____

Contrary to the circuit court's ruling, the Schlussels' "ordinary" living expenses are meaningless under the MUFTA. Rather, the issue is the reasonableness of the consideration received for the transfer from the perspective of the *creditor*. *Nt'l L Investors, LP v Robinson*, 98 SW3d 781, 784 n 2 (Tex App, 2003):

> Indeed, if the legitimacy of a conveyance was determined from the perspective of the debtor, it is questionable whether any transfer could ever be considered fraudulent *viz* his creditors. No doubt the debtor could always divine some explanation for transferring the property as he did, even though his creditors are left with nothing to satisfy the debt. He could always divine some subjective benefit which may be valueless to the creditor.

[10] Remedies other than avoidance are available to the judgment creditor, including the appointment of a receiver and the imposition of a constructive trust.

sense. If Mark exchanged his law firm check for a car, the dealer who sold him the vehicle would not be subject to avoidance of the transfer, because the dealer gave value in exchange. In other words, the MUFTA protects good faith purchasers for value. But neither Rose Lynn nor M & A gave anything in exchange for the transfers, rendering § 8 inapplicable. Because the transfers of Mark's money were entirely gratuitous as to Rose Lynn and M & A, the Schlussels cannot avoid liability by interposing a "reasonably equivalent value" defense, and the circuit court erred by applying this *remedy* provision as a legal bar to Dillard's actual intent claim.

Genuine issues of material fact exist concerning Mark's intent in transferring his law firm earnings to Rose Lynn. Summary disposition is inappropriate for deciding cases premised on intent, good faith, or reasonableness. Accordingly, the circuit court improperly granted summary disposition of Dillard's §4(1)(a) claim under MCR 2.116(C)(10).

## B. CONSTRUCTIVE FRAUD

Dillard's alternate fraudulent conveyance claim arises under MCL 566.35(1), which provides in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

This provision is concerned with the economic realities of a transfer rather than the transferor's intent.

The sole issue placed in dispute concerning Dillard's claim under § 5(1) is whether Rose Lynn provided "reasonably equivalent value" in exchange for the money transferred to her by her husband. The Schlussels equate "reasonably equivalent value" with their "ordinary" household expenses. According to defendants, because the Schlussels spent all the transferred money on their own household expenses, they were entitled to summary disposition of Dillard's constructive fraud claim. This argument finds no support in case law, or in the logic or language of the MUFTA.

Pursuant to the plain language of MCL 566.35, a transfer is constructively fraudulent if the debtor did not receive a "reasonably equivalent value in exchange for the transfer" and was insolvent at the time. Under the MUFTA,

> (1) Value is given for a transfer . . . if, in exchange for the transfer . . ., property is transferred or an antecedent debt is secured or satisfied. Value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

* * *

-16-

(3) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous. [MCL 566.33.]

The commentary to the uniform act provides:

"Value" is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition. [7A Uniform Laws Annotated, § 3, Cmt 2, p 48.]

"An unperformed promise to provide support is the only consideration that does not constitute value as a matter of law." *In re Schaefer*, 331 BR 401, 419 (ND Iowa, 2005). Indirect, noneconomic benefits that preserve a family relationship do not provide reasonably equivalent value. *In re Bargfrede*, 117 F3d 1078, 1080 (CA 8, 1997). Thus, any promise made by Mark to support his wife, or to pay their joint household expenses, has no bearing here.

The first element under § 5(1) relates to timing. Dillard's claim potentially arose in 2004, when she demanded payment under the guaranty. This fact question must be resolved in the trial court. Indisputably, Dillard's claim arose before many of the transfers were made, fulfilling the first element. Mark's insolvency, the third element, also constitutes a question of fact. But Mark has admitted insolvency as of the date of the 2008 judgment, rendering many transfers actionable. The second element, whether Mark "made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer," is where the battle lines are drawn.

"Reasonably equivalent value" is a commercial concept. "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank, NA v Metro Communications, Inc*, 945 F2d 635, 647 (CA 3, 1991). This is not to say that the Schlussels' use of some of the transferred funds for reasonable and necessary household expenses is irrelevant. If Mark received property or secured a preexisting debt through the transfers, and if the value of the property or the preexisting obligations were reasonably equivalent to the amount transferred, Dillard's constructive fraud claim may ultimately fail.

Record evidence substantiates that Mark received no contemporaneous value from Rose Lynn for the transfers made to her. Any "value" came later, indirectly, when Rose Lynn used the money to pay other creditors. However, "value" obtained from the checks down the road is simply inconsequential under the MUFTA. Judge Posner has explained:

[W]e think the inquiry should stop at the first stage of the analysis, that is, should stop after it is determined that the transfer was not supported by consideration. If it was gratuitous, the fact that some or for that matter all of it may later have seeped back to the debtor does not legitimize the transfer. . . . A compelling reason for stopping at the first stage is that the seeping back of the transferred money or property to the transferor is strong evidence of actual fraud by him. It is one thing to make a gift; it is another to transfer money to someone whom you expect to retransfer it to you; the inescapable implication is that you are parking

-17-

your money in a place where you hope your creditors won't know to look. [*The Nostalgia Network v Lockwood*, 315 F3d 717, 720 (CA 7, 2002) (citations omitted).]

Defendants and the circuit court premise their contrary conclusion primarily on *United States v Goforth*, 465 F3d 730 (CA 6, 2006), a case brought under the Federal Debt Collection Procedures Act (FDCPA), 28 USC 3001 *et seq*. Aside from the fact that *Goforth* is not binding on this Court, defendants and the circuit court have misread the case. Properly understood, *Goforth* supports that at best, the Schlussels' household expense claim creates a question of fact precluding summary disposition in favor of Dillard for the full amount of the transfers.

Like the MUFTA, the FDCPA addresses fraudulent transfers. The latter statute involves debts to the United States rather than to general creditors. The FDCPA provides for the avoidance of constructively fraudulent transfers, 28 USC 3304(a), and transfers made with actual intent to defraud, 28 USC 3304(b)(1)(A). In *Goforth*, the government contended that monthly payments from debtor George Gilley to his wife, Sheila Gilley, ranging from $1,800 to $2,000 and made over the course of a 19-year period, constituted fraudulent transfers under the FDCPA. *Id.* at 732. The monthly payments ended four years before the government obtained judgment against Gilley and his corporation. The district court entered summary disposition in favor of the government, finding the transfers constructively fraudulent. *Id.*

The Court of Appeals for the Sixth Circuit held that Sheila Gilley's affidavit attesting that she used the monthly payments for routine living expenses created a fact question regarding whether Gilley had received "reasonably equivalent value" for the money, thereby precluding summary disposition. Contrary to the circuit court's interpretation of the case, the Sixth Circuit did not grant summary judgment in Sheila's favor. Nor did the Sixth Circuit hold that payment of household expenses with fraudulently transferred funds constitutes a complete defense to a claim brought under the FDCPA. Rather, the Sixth Circuit simply held that the district court erred by granting summary judgment to the government without considering the merits of Sheila's "reasonably equivalent value" defense.

Aside from the fact that defendants have mischaracterized *Goforth* as creating a complete "living expenses" defense, common sense dictates that spending money on oneself or one's spouse does not automatically trump a fraudulent transfer claim. If it did, the MUFTA would be a useless waste of ink and paper, as every debtor would simply transfer any cash in his possession to a covert account, spend it freely, and thereby avoid liability on a court-entered judgment. The circuit court's ruling would freely permit a debtor and his spouse to avoid liability for an otherwise fraudulent transfer simply by spending the money on themselves. Our Supreme Court long ago condemned this reasoning in a similar case, in which the creditor-plaintiff claimed that the debtor-defendants had placed their property "under cover of the wife with intent to thereby keep the same away from the creditors of the husband." *Morse v Roach*, 229 Mich 538, 541; 201 NW 471 (1924). The Court affirmed a judgment in the plaintiff's favor, concluding with this colorful language:

Subsequent accumulations, being those of the husband, are not covered by the skirts of the wife. Defendants have treated such subsequent accumulations as belonging to the husband up to the point where creditors try to step in. The

-18-

transparent screen of the ownership of the wife offers no insurmountable hurdle to the law. [*Id*.]

The MUFTA is not so easily circumvented.

Federal law protects a judgment debtor from losing all ability to support himself and his family by allowing a creditor to garnish only up to 25% of the debtor's weekly disposable earnings. 15 USC 1673(a)(1). Looked at from the other direction, federal law permits a debtor to retain 75% of his weekly paycheck. Presumably, the law is intended to strike a balance by permitting a debtor to pay living expenses while also owning up to the financial consequences of a judgment. This exemption, blended into the MUFTA's definition of an "asset," inherently recognizes that "no man should be permitted to live at the same time in luxury and in debt." *In re Portnoy*, 201 BR 685, 693 (SD NY, 1996) (citation omitted). Like the United States Court of Appeals for the Third Circuit, we "see no reason that the law of fraudulent transfer should permit an insolvent debtor to transfer his own funds out of the reach of his creditors—frustrating or delaying attempts to recover a debt—while still directing the use of those funds towards amenities of his choice." *Cardiello v Arbogast*, 533 Fed Appx 150, 157 (CA 3, 2013).

That said, we do not decide the question of whether Mark received "reasonably equivalent value" for the transfers, and reserve it for the finder of fact. Whether the Schlussels used the transferred funds to pay *reasonable* expenses, including the claims of other creditors (such as the holder of their mortgage, their taxes, and their utilities), and whether those expenditures constitute "reasonably equivalent value" for the transfers, must be decided after a trial.

On the basis of the same reasoning, we reverse the circuit court's ruling regarding the Pacific Life insurance policy. Record evidence supports that in March 2010, the "M & A Enterprises LLC Defined Benefit Plan & Trust" obtained a $40,000 loan against the policy. At that time, Mark was the only plan participant. He subsequently arranged to transfer this asset to Rose Lynn, and to transfer ownership of the life insurance policy to his wife. The circuit court erred in concluding that because the policy was "owned" by M & A at the time of the transfer, Mark's acts could not be considered fraudulent. On remand, the circuit court must determine whether the loan check issued by Pacific Life constituted Mark's "property," as that term is defined in MCL 566.31(j). If so, the trial court must address whether Mark transferred the property by applying MCL 566.31(*l*).

In summary, material questions of fact preclude summary disposition in this case, including Mark's intent under § 4(1)(a), see *Szkrybalo v Szkrybalo*, 477 Mich 1086; 729 NW2d 233 (2007), and whether any of the transfers to Rose Lynn and then to M & A were made for reasonably equivalent value. The presence of multiple badges of fraud establishes a prima facie case of fraudulent transfer that is not negated by the Schlussels' expenditure of the money on their "ordinary" household expenses. Nor does the Schlussels' expenditure of hundreds of thousands of dollars each year on themselves immunize Dillard's claim for constructive fraud.

Viewed in the light most favorable to Dillard, record evidence supports that the Schlussels not only put their needs and wants ahead of their creditor, but transferred assets intending to place those assets outside the creditor's reach.

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Joel P. Hoekstra
/s/ Elizabeth L. Gleicher