# STATE OF MICHIGAN

# COURT OF APPEALS

RKA PETROLEUM COMPANIES, INC.,

        Plaintiff-Appellant,

v

JOSEPH KRATOCHVIL and ATLAS OIL
COMPANY,

        Defendants-Appellees.

UNPUBLISHED
April 14, 2016


No. 324172
Wayne Circuit Court
LC No. 13-000728-CK

Before: GLEICHER, P.J., and JANSEN and SHAPIRO, JJ.

PER CURIAM.

RKA Petroleum Companies, Inc. filed suit against its former employee, Joseph Kratochvil, and Kratochvil's subsequent employer, Atlas Oil Company, based on their attempts to lure another RKA employee to forsake her job at RKA for employment at Atlas. The circuit court summarily dismissed RKA's claims, discerning no material question whether Kratochvil breached his nonsolicitation agreement with RKA or whether Atlas interfered with that contract. As RKA presented evidence that Kratochvil acted in contravention of the nonsolicitation agreement's plain language, we vacate the summary dismissal of RKA's claims against him, but otherwise affirm.

## I. FACTS AND PROCEDURAL HISTORY

Kratochvil briefly joined RKA in August 2012 as its Vice President of Information Technologies and Services. His contract included the following "non-solicitation" paragraph:

> 5. During the Non-Solicitation Period, I will not, directly or indirectly, hire, solicit, or encourage to leave the Company's employ any employee of the Company, or hire any former employee of the Company within one year of the date such person ceases to be a Company employee.

Kratochvil resigned from RKA on October 26, 2012. That same day, he accepted a position with RKA competitor Atlas Oil Company as "Director of Delta," a specialized IT department. His first official day on the job at Atlas was November 5, 2012.

-1-

At the time of these events, Laurie Lamphear had worked for RKA for five years as a tax manager. After Kratochvil resigned from RKA but before his first day on the job at Atlas, Lamphear interviewed for employment at Atlas. According to Lamphear's affidavit:

> After the interviews, Joe Kratochvil and Sarah Crooks called to tell me that Defendant Kratochvil was going to be my manager at Atlas Oil Company. He also discussed with me what my role was going to be at Atlas Oil Company, as well as Joe Kratochvil's vision of the IT department and my involvement in that vision.

On November 20, 2012, Atlas's CEO emailed Kratochvil with the following request regarding Lamphear: "Can you please provide me with your thoughts on the structure of the offer, including logistics." A follow-up email that day indicated that Kratochvil and others "recommend[ed] a starting salary of $80k." Kratochvil then signed an "Offer Letter Request Form." The next day, Lamphear received a letter from Kratochvil offering her a position at Atlas. The letter closed with the following paragraph:

> Laurie, please feel free to contact me if you have questions about the information contained in this Letter. We look forward to your arrival at Atlas and are confident that you will play a key role in Atlas'[s] growth. On behalf of the entire Team at Atlas, I look forward to welcoming you aboard.

Lamphear accepted Atlas's offer on November 21, but rescinded her acceptance shortly thereafter. In its effort to retain Lamphear, RKA offered a pay increase to $100,000 annually. Lamphear asserted that she decided to stay with RKA not because of the money, but because her husband's health was declining. Lamphear's letter rescinding her acceptance, addressed solely to Kratochvil, begins: "I would like to thank you for offering me the position of Process Improvement Analyst . . . ." In response, Kratochvil emailed her: "Please reach out to me on my cell to discuss."

RKA subsequently filed suit, raising a breach of contract claim against Kratochvil and accusing Atlas of tortiously interfering with that contractual relationship. Following discovery, the circuit court summarily dismissed both claims.

## II. STANDARD OF REVIEW

Kratochvil and Atlas sought summary disposition under MCR 2.116(C)(8) and (10), which the court granted without citing the subrule supporting its decision. As the court considered evidence beyond the pleadings, we review the decision as if made under MCR 2.116(C)(10). See *Haynes v Village of Beulah*, 308 Mich App 465, 467; 865 NW2d 923 (2014). We review such decisions de novo, considering whether the plaintiff presented sufficient evidence to create a genuine issue of material fact and whether moving party is entitled to judgment as a matter of law. *Weingartz Supply Co v Salsco Inc*, 310 Mich App 226, 232; 871 NW2d 375 (2015). When considering a motion for summary disposition, a court may not make credibility determinations, weigh the record evidence, or decide which inferences to credit and which to ignore. *Dillard v Schlussel*, 308 Mich App 429, 445; 865 NW2d 648 (2014). Rather, a court must draw all justifiable inferences in favor of the nonmoving party, focusing on whether

the evidence gives rise to a material dispute of fact. "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). Thus, we must construe the evidence from RKA's perspective.

## III. KRATOCHVIL

### A. ANALYSIS

Nonsolicitation clauses such as the one in Kratochvil's contract with RKA are designed to protect an employer's investment in its employees and any confidential information they maintain. The paragraph at issue was broadly worded to prohibit Kratochvil from making *any* efforts to invite an RKA employee to leave RKA's employ, or to assist in such an employment transition, or to bolster the employee's nerve to jump ship. One way to invite someone to do something is to issue a direct proposal, such as "come on over and visit." An indirect approach might be, "are you interested in admiring my etchings?" The provision in this case prohibits both. By signing the contract, Kratochvil promised not to take any action that would advance an RKA employee's transfer to a new employer. Sending a former coemployee an employment contract, discussing ways to hire her with one's new colleagues, calling her to discuss the offered employment, and encouraging her to reconsider her decision to rescind offered employment all violate that promise.

Kratochvil's breach is also supported by the dictionary definitions of the terms employed in his contract. To "solicit" means "[t]o seek to obtain by persuasion, entreaty, or formal application." *The American Heritage Dictionary of the English Language* (5th ed), p 1666. Alternatively, "solicit" is defined as: "to ask or seek earnestly or pleadingly; appeal to or for." *Webster's New World Dictionary of the American Language* (2d College ed), p 1355. To "hire" means "[t]o engage the services of." The word encompasses "[t]he act of hiring." *The American Heritage Dictionary of the English Language* at 832. And to "encourage" someone to do something means "[t]o inspire with hope, courage, or confidence" or "[t]o give support to; foster." *Id*. at 587.

The record evidence substantiates that Kratochvil "hired" Lamphear when he sent her a letter offering employment; whether this was a direct or an indirect method is a debate not worth having, as both are precluded by the contract. By "welcoming her aboard" in the letter, Kratochvil supported Lamphear's decision to leave RKA, thereby inspiring her to join his new team. Indirectly, Kratochvil "fostered" Lamphear's career move when he asked her to "reach out" to discuss why she had precipitously changed her mind about Atlas employment. And a reasonable jury could certainly decide that Kratochvil conspired with others at Atlas to formulate an offer that Lamphear would readily accept, thereby indirectly "seeking earnestly" a method to compel her to leave her employment. It is irrelevant that Lamphear initiated her move to Atlas before Kratochvil officially commenced employment there. The nonsolicitation clause prohibits Kratochvil from lending his hand to Atlas's efforts to effectuate Lamphear's job switch. Once Kratochvil came on board, he immediately did just that, at least when the evidence is viewed in the light most favorable to RKA.

Kratochvil and Atlas assert as an alternative ground to affirm the circuit court's summary disposition ruling that RKA failed to present evidence that it was damaged as a result of any potential breach. Specifically, defendants emphasize Lamphear's testimony that she would have remained at RKA for personal reasons even if RKA had not offered her $25,000 in additional compensation annually. To accept this conclusion, however, we would have to accept as credible Lamphear's testimony that "the increase in her salary was immaterial to her decision." The judiciary may not weigh the evidence and declare a winner at the summary disposition stage. A jury could well believe that despite Lamphear's testimony, she remained with RKA because she got a lot more money for doing so.

## B. RESPONSE TO THE OPINION CONCURRING IN PART AND DISSENTING IN PART

Our colleague's opinion concurring in part and dissenting in part takes issue with our conclusion that record evidence demonstrates a question of material fact regarding whether Kratochvil breached the nonsolicitation clause. According to the concurring and dissenting opinion, Kratochvil's actions are correctly construed only as meaningless bureaucratic exercises that did not impact Lamphear's decision to leave RKA. The record facts and the words of the nonsolicitation clause compel our respectful disagreement with these arguments.

In clear and unambiguous language, the contract prohibited Kratochvil from directly or indirectly soliciting, hiring, or encouraging an RKA employee to leave RKA's employ. Notably, the nonsolicitation clause did not premise its applicability on a *successful* solicitation. Kratochvil not only sent an RKA employee a letter offering her new employment, he called her to discuss the proposed job. A reasonable jury could readily conclude that sending a potential employee a letter offering employment and calling to discuss the job aligns with "direct" solicitation or hiring. But at a minimum, these acts could be construed by a jury as *indirect* solicitation, hiring, or encouragement designed and intended to persuade Lamphear to leave RKA's employ. Other evidence detailed above creates a fact question as to whether Kratochvil worked behind the scenes (again, "indirectly") to steal an employee from his former employer.

The concurring and dissenting opinion appears to manufacture a new summary disposition defense to Kratochvil's liability in this garden-variety breach-of-contract claim: defendant's breach was "a mere formality." We are uncertain of the meaning of this phrase, but find no example of a "mere formality" defense in established contract law. Rather, the question to be decided on summary disposition is whether admissible evidence could support a reasonable conclusion by the factfinder that Kratochvil participated in Atlas's efforts to steal Lamphear from RKA, thereby breaching the nonsolicitation clause. As noted, abundant evidence supports a conclusion that Kratochvil was integrally involved in Atlas's solicitation efforts. That Kratochvil claims to the contrary merely gives rise to a credibility question outside the scope of a proper summary disposition analysis. See *White v Taylor Distributing Co, Inc*, 482 Mich 136; 753 NW2d 591 (2008).

Moreover, the contract does not merely forbid direct solicitation, hiring or encouragement. It also bars "*indirect*" solicitation, hiring or encouragement. Thus, contrary to our colleague's suggestion, it is not even necessary that RKA demonstrate direct contact between Lamphear and Kratochvil before Lamphear accepted employment with Atlas. There is ample evidence that Kratochvil was consulted by Atlas regarding "the structure of the offer [to

Lamphear], including logistics." Kratochvil then recommended that a certain salary be offered and signed an offer letter. These actions are certainly sufficient grounds for a reasonable jury to conclude that Kratochvil indirectly solicited RKA's employee. It is a basic principle of contractual interpretation, "courts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003). Respectfully, the concurring and dissenting opinion reads the word "indirectly" out of the contract.

Our colleague further discounts Kratochvil's actions because Lamphear initiated her move to Atlas before Kratochvil officially commenced employment there. But the concurring and dissenting opinion fails to explain how or why this makes a difference. The nonsolicitation clause prohibits Kratochvil from lending his hand to Atlas's efforts to effectuate Lamphear's job switch and places no limitations on that prohibition. And when the evidence is viewed in the light most favorable to RKA, it would be reasonable to conclude that that is exactly what he did.

At trial, a jury may construe Kratochvil's acts as "mere formalities" and decide the case in his favor. But reaching that conclusion requires deciding which witnesses to believe and which inferences to credit. Those decisions are for the jury alone.

## IV. ATLAS

Despite our conclusion that summary disposition was inappropriate as to RKA's claim against Kratochvil, we discern no error in the circuit court's ruling as to Atlas. Kratochvil's role in the attempted theft of Lamphear is clear. But Atlas's motives remain utterly opaque as RKA presented no evidence to create a genuine issue of material fact in this regard.

"The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 89-90; 706 NW2d 843 (2005). "[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Badiee v Brighton Area Sch*, 265 Mich App 343, 367; 695 NW2d 521 (2005) (citations and quotation marks omitted; alteration in original). " 'A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances.' " *Id*. (citation omitted). " 'If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference.' " *Id*. (citation omitted). "Thus, it is an essential element of a claim of tortious interference with a contract that the defendant 'unjustifiably instigated or induced' the party to breach its contract." *Knight Enterprises, Inc v RPF Oil Co*, 299 Mich App 275, 281; 829 NW2d 345 (2013) (citation omitted).

That Atlas permitted Kratochvil to be involved in the hiring process does not support a tortious interference claim. That act, standing alone, does not constitute a wrongful act per se. That act was not inherently wrongful and could be justified under certain circumstances. See *Badiee*, 265 Mich App at 367. RKA failed to establish any malice on Atlas's part. There simply

-5-

is no evidence that Atlas induced Kratochvil to participate in soliciting Lamphear with malice or for the purpose of causing Kratochvil to breach his RKA contract. Accordingly, the circuit court properly dismissed this claim.

RKA points to internal email correspondence establishing that Atlas officials were aware that an RKA nonsolicitation clause could complicate the hiring process. Around the same time that Atlas hired Kratochvil and offered employment to Lamphear, Atlas hired or offered employment to at least three additional RKA employees. In various emails, Atlas officials opined that RKA employees should be hired at the same time to avoid getting "into any 'non-compete' legal battles with RKA." Atlas leadership also wanted to conduct its interviews of RKA employees in a neutral location to protect against other RKA employees becoming suspicious and reporting the mutiny to RKA higher ups. Another message cited "the competitive history between" RKA and Atlas and recommended that any correspondence relating to the hiring of Kratochvil and two others be copied to in-house counsel to preserve legal confidentiality.

However, none of these emails establish that Atlas unjustifiably and improperly instigated or induced *Kratochvil* to breach his nonsolicitation agreement. See *Knight Enterprises*, 299 Mich App at 281. At most, the messages reveal Atlas's general awareness that RKA employees may be operating under noncompete agreements and wished to proceed as privately as possible. None of the cited messages discuss Kratochvil's role in Atlas's hiring process. Thus, there is no indication that Atlas unjustifiably instigated or induced Kratochvil to breach his nonsolicitation agreement. Therefore, the circuit court properly granted summary disposition in favor of Atlas on RKA's tortious interference claim.

We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Douglas B. Shapiro