JEDDO DRYWALL, INC v CAMBRIDGE INVESTMENT GROUP, INC

Docket No. 295726. Submitted March 8, 2011, at Detroit. Decided August 2, 2011, at 9:05 a.m.

Jeddo Drywall, Inc., brought an action in the Wayne Circuit Court against Cambridge Investment Group, Inc., Cambridge Meadows, LLC, and others, seeking enforcement of its construction liens for work performed on and materials supplied for construction of a residential structure on Lot 204 in Phase 3 of the Cambridge Meadows Subdivision No. 3 in Brownstown Township. Stock Building Supply, LLC, subsequently filed a cross-claim, counterclaim, and third-party complaint to foreclose on its construction liens for the same project. Cambridge Meadows, LLC, had executed a mortgage on March 17, 2005, with Ohio Savings Bank (later known as AmTrust Bank) to finance land acquisition, as well as future construction advances. The subdivision secured the mortgage. Clearing, grading, paving, and utility work had been done in the subdivision in 2002 before the origination date of the mortgage. Stock first provided materials to construct the residence on Lot 204 on February 3, 2006, the date the building permit was issued for the residence, while Jeddo first supplied labor and materials for the residence in September 2006. After AmTrust became insolvent, AmT CADC Venture, LLC, was appointed receiver and substituted for AmTrust as a party. The court, Isidore B. Torres, J., granted summary disposition in favor of Jeddo and Stock pursuant to MCR 2.116(C)(10), finding that their construction liens had priority over the mortgage held by AmTrust. The court reasoned that the Construction Lien Act (CLA), MCL 570.1101 et seq., required this result because actual physical improvements had been made to Lot 204 before AmTrust recorded its mortgage in 2005. AmT CADC Venture appealed.

The Court of Appeals held:

1. The CLA is a remedial statute that must be liberally construed to secure the beneficial results, intents, and purposes of the act. It was meant to protect the right of the lien claimants to payment for wages or materials and to protect owners from paying twice for those services. Under 570.1119(3), a construction lien takes priority over all other interests, liens, or encumbrances that

may attach to the building, structure, or improvement when the other interests, liens, or encumbrances are recorded after the first actual physical improvement. MCL 570.1103(1) defines "actual physical improvement" as the actual physical change in or alteration of real property as a result of labor that a contractor, subcontractor, or laborer provides pursuant to a contract and that is readily visible and of a kind that would alert a person upon reasonable inspection of the existence of an improvement. Liens relate back to the first actual physical improvement regardless of when or the person by whom the particular work was done or the materials furnished for which a lien is claimed.

2. The clearing, grading, paving and installation of utilities in 2002 on property that included Lot 204 constituted an actual physical improvement to the property. Even though the owners and developers of the project changed throughout the years, the evidence demonstrated that they were all related entities with partial common ownership and, more importantly, the various permits issued always referred to the development of Phase 3. The actual physical improvements made in 2002 were related to the same project for which Jeddo and Stock provided labor and materials in 2006. Jeddo's and Stock's construction liens had priority over the AmTrust mortgage because their first work on Lot 204 in 2006 related back to the first actual physical improvements in 2002, which preceded the recording of the AmTrust mortgage.

3. Under MCL 570.1107(3), a change in ownership of a construction project does not alter the validity of a lien. Nothing in the CLA alters the priority of a contractor's lien when there is a change of ownership of property to indisputably related companies continuing the same development project.

4. MCL 570.1111(1) requires a contractor, subcontractor, laborer, or supplier to file a construction lien within 90 days after the lien claimant last furnished labor or material for an improvement or the right to the lien will cease to exist. MCL 570.1117(1) requires that proceedings for the enforcement of a construction lien be brought no later than one year after the date the claim of lien was recorded. After Stock recorded its construction lien on April 12, 2006, it filed three "amended" claims of liens as time elapsed. Stock's third amended claim of lien covered work from the time Stock first provided materials for construction on Lot 204 (February 3, 2006) until the last date it provided materials (April 27, 2007). The third amended lien was valid, and the instant action was timely filed within one year of the date the lien was recorded. All the liens related to materials provided for a single portion of the development project: construction of the residence on Lot 204.

Because it was required to record its lien within 90 days of the last furnishing of material, Stock properly protected its right to payment by filing liens during the various delays in construction.

Affirmed.

1. MECHANICS' LIENS — CONSTRUCTION LIENS — PRIORITY — ACTUAL PHYSICAL IMPROVEMENTS.

A construction lien takes priority over all other interests, liens, or encumbrances that may attach to the building, structure, or improvement when the other interests, liens, or encumbrances are recorded after the first actual physical improvement; "actual physical improvement" means the actual physical change in or alteration of real property as a result of labor that a contractor, subcontractor, or laborer provides pursuant to a contract and that is readily visible and of a kind that would alert a person upon reasonable inspection of the existence of an improvement; construction liens relate back to the first actual physical improvement regardless of when or by whom the particular work was done or the materials furnished for which a lien is claimed (MCL 570.1103[1]; MCL 570.1119[3]).

2. MECHANICS' LIENS — CONSTRUCTION LIENS — CHANGE IN PROJECT OWNERSHIP — PRIORITY.

A change in ownership of a construction project does not alter the validity of a construction lien; nothing in the Construction Lien Act alters the priority of a contractor's lien arising out of a construction project when there is a change of ownership of the property to related companies (MCL 570.1107[3]).

3. MECHANICS' LIENS — CONSTRUCTION LIENS — CLAIM OF LIEN — RECORDING — LIMITATION OF ACTIONS.

A contractor, subcontractor, laborer, or supplier must file a construction lien within 90 days after the lien claimant last furnished labor or material for an improvement or the right to the lien will cease to exist; a proceeding for the enforcement of a construction lien must be brought no later than one year after the date the claim of lien was recorded (MCL 570.1111[1]; MCL 570.1117[1]).

*Laura M. Beam* for Jeddo Drywall, Inc.

*May, Simpson & Strote* (by *Ronald P. Strote* and *Marilyn K. Smyth*) for Stock Building Supply, LLC.

*Dawda, Mann, Mulcahy & Sadler, PLC* (by *John Mucha, III, Randall R. Cole,* and *Kenneth A. Flaska*), for AmT CADC Venture, LLC.

Before: WILDER, P.J., and SAAD and DONOFRIO, JJ.

SAAD, J. AmT CADC Venture, LLC, formerly known as AmTrust Bank,[1] appeals the trial court's grant of summary disposition to plaintiff, Jeddo Drywall, Inc., and counterplaintiff/cross-plaintiff, Stock Building Supply, LLC. For the reasons set forth below, we affirm.

### I. FACTS AND PROCEEDINGS

The issue presented here is whether construction liens recorded by Jeddo and Stock have priority over a mortgage lien recorded earlier by AmTrust. Cambridge Meadows, LLC, failed to pay Jeddo and Stock for labor and materials they supplied to build a residential structure on Lot 204 in the Cambridge Meadows subdivision in Brownstown Township. On March 17, 2005, in exchange for a loan of $757,500, Cambridge Meadows executed a mortgage for land acquisition and future construction advances with AmTrust. The mortgage was secured by Cambridge Meadows Subdivision No. 3, which is a parcel of property that includes Lot 204. The mortgage was recorded on March 25, 2005. Though prior clearing, grading, paving, and utility work had been done in the subdivision, on February 3, 2006, Brownstown Township issued a permit for the construction of a single family home on Lot 204. On the

---

[1] Ohio Savings Bank, which later became known as AmTrust Bank, was the lender that originally entered into the mortgage at issue in this case. When AmTrust became insolvent, the Federal Deposit Insurance Corporation was appointed receiver and was substituted as the defendant/cross-defendant-appellant in this appeal. Thereafter, AmT CADC Venture, LLC, was appointed receiver and was substituted as the defendant/cross-defendant-appellant. For ease of reference, and because it was the name of the entity during most of the litigation, we refer to the bank that issued the mortgage on the disputed property as "AmTrust" throughout this opinion.

same date, Stock provided material to construct the home on Lot 204 for the first time. Jeddo supplied labor and materials to build the house on Lot 204 in September 2006. As noted, Jeddo and Stock were not paid, and both companies filed construction liens under the Construction Lien Act (CLA), MCL 570.1101 *et seq*.

AmTrust foreclosed on the Cambridge Meadows Subdivision No. 3 mortgage during the fall of 2008, and a sheriff's sale was conducted on December 3, 2008. The property was not redeemed. On December 4, 2008, Jeddo filed this action against, among others, Jeffrey and Rodney Walker, Cambridge Meadows, LLC, Cambridge Investment Group, Inc., Fountain Homes, Inc., and AmTrust to foreclose on its construction lien. Subsequently, Stock filed a cross-/counter-/third-party complaint to foreclose on its construction liens. The trial court entered default judgments against several defendants, and Jeddo and Stock filed motions for summary disposition against AmTrust, arguing that their construction liens had priority over the mortgage held by AmTrust. The trial court agreed and granted them summary disposition, ruling that there were no genuine issues of material fact. The trial court reasoned that because actual physical improvements had been made to Lot 204 before AmTrust recorded its mortgage, under MCL 570.1119 the construction liens had priority as a matter of law.

## II. ANALYSIS

### A. PRIORITY

The trial court granted summary disposition to Jeddo and Stock pursuant to MCR 2.116(C)(10). As this Court explained in *Michigan Pipe & Valve-Lansing, Inc v Hebeler Enterprises, Inc*, 292 Mich App 479, 483; 808 NW2d 323 (2011),

> [w]e review de novo a trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Summary disposition is proper under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law."

This Court also reviews de novo questions of statutory interpretation. *Id*. The parties agree that this case is controlled by the CLA. As set forth in MCL 570.1302(1), the CLA is "a remedial statute, and shall be liberally construed to secure the beneficial results, intents, and purposes of this act." Further, "[s]ubstantial compliance with the provisions of this act shall be sufficient for the validity of the construction liens provided for in this act, and to give jurisdiction to the court to enforce them." MCL 570.1302(1). As this Court further explained in *Michigan Pipe*, 292 Mich App at 483-484,

> [t]he goal of statutory interpretation is to give effect to the intent of the Legislature. *Kuznar v Raksha Corp*, 481 Mich 169, 176; 750 NW2d 121 (2008). If the language of the statute is unambiguous, the Legislature is presumed to have intended the meaning plainly expressed, and judicial construction is not permitted. *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 141; 783 NW2d 133 (2010). An unambiguous statute must be enforced as written. *Klida v Braman*, 278 Mich App 60, 64; 748 NW2d 244 (2008).

As our Court explained in *M D Marinich, Inc v Mich Nat'l Bank*, 193 Mich App 447, 453; 484 NW2d 738 (1992),

> [o]ur Legislature enacted the Construction Lien Act effective March 31, 1981, in order to remedy many of the problems associated with a preceding act, the Mechanics' Lien Act of 1891. The Construction Lien Act was declared by the Legislature to be a remedial statute and shall be liberally construed to secure the beneficial results, intents,

and purposes of the act. MCL 570.1302(1); *Fischer-Flack, Inc v Churchfield*, 180 Mich App 606, 610; 447 NW2d 813 (1989). It has long been recognized that construction lien laws serve two purposes: to protect the right of lien claimants to payment for wages or materials and to protect owners from paying twice for such services. *Id.* at 611.

With regard to the priority of construction liens over other encumbrances, MCL 570.1119(3) provides:

> A construction lien arising under this act shall take priority over all other interests, liens, or encumbrances which may attach to the building, structure, or improvement, or upon the real property on which the building, structure, or improvement is erected when the other interests, liens, or encumbrances are recorded subsequent to the first actual physical improvement.

Thus, pursuant to MCL 570.1119(3), a construction lien that arises under the CLA takes effect upon the first actual physical improvement to the property and has priority over all interests recorded after the first actual physical improvement. *Marinich*, 193 Mich App at 454. The phrase "actual physical improvement" is defined in MCL 570.1103(1), which provides:

> "Actual physical improvement" means the actual physical change in, or alteration of, real property as a result of labor provided, pursuant to a contract, by a contractor, subcontractor, or laborer which is readily visible and of a kind that would alert a person upon reasonable inspection of the existence of an improvement. Actual physical improvement does not include that labor which is provided in preparation for that change or alteration, such as surveying, soil boring and testing, architectural or engineering planning, or the preparation of other plans or drawings of any kind or nature. Actual physical improvement does not include supplies delivered to or stored at the real property.

Our courts have further held that liens relate back to the first actual physical improvement " 'regardless of

the time when, or the person by whom, the particular work was done or the materials furnished for which a lien is claimed.' " *Marinich*, 193 Mich App at 452, quoting *Kay v Towsley*, 113 Mich 281, 283; 71 NW 490 (1897).

AmTrust argues that the trial court erred by granting summary disposition to Jeddo and Stock because no actual physical improvements were made to Lot 204 before AmTrust recorded its mortgage. As discussed, the record reflects that Lot 204 was a lot within a parcel of land alternatively referred to as Cambridge Meadows Subdivision No. 3, or "Phase 3" of the Cambridge Meadows Subdivision. To the extent that AmTrust contends that the first actual physical improvement had to occur on Lot 204 to give Jeddo's and Stock's liens priority, we disagree. The mortgage covers the entirety of Cambridge Meadows Subdivision No. 3, which specifically includes Lot 204, regardless of whether the first actual physical improvements were made to other parts of the property covered by the mortgage. In any case, Jeddo and Stock submitted evidence to show that actual physical improvements were made to areas that included Lot 204.

On August 1, 2002, the Wayne County Department of Environment issued a permit for Cambridge Investment Group to perform "[m]ass grading, proposed utility construction and paving" for a land area that includes Lot 204. Before the issuance of this permit, the Michigan Department of Environmental Quality issued a permit for the construction of various water mains throughout Cambridge Meadows Subdivision No. 3. On September 9, 2002, the Wayne County Department of Public Services issued permits for the installation of water mains, storm sewers, and sanitary sewers and to pave proposed roads in the subdivision. On the same

date, the Wayne County Department of Public Works issued permits to King/Inkster I, LLC, to pave roads within the subdivision and connect them to Wayne County roads.

AmTrust's argument is well-taken that permits issued for physical improvements do not establish that those improvements were actually made. However, Jeddo and Stock submitted other evidence to establish that the lots in Phase 3 were, indeed, developed as anticipated by the permits. An appraisal sent to a prior lender, Republic Bank, on October 20, 2002, states that, with regard to Phase 3, "[a]s of October 4, 2002, improvements completed include underground utilities, clearing, grading, etc." Further, AmTrust's mortgage with Cambridge Meadows, LLC, specifically states that each single family building site in "Phase III" was fully developed, which indisputably includes Lot 204.

Pursuant to MCL 570.1103(1), clearing, grading, paving, and the installation of utilities clearly constitute actual physical improvements to the land because the work was an "actual physical change in, or alteration of, real property." This work was sufficient to visibly place others on "notice that there may be outstanding liens against the property because construction work is in progress." *Marinich*, 193 Mich App at 455. Thus, the evidence submitted to the trial court established that actual physical improvements were made to Cambridge Meadows Subdivision No. 3, including specifically to Lot 204 as of October 4, 2002. AmTrust failed to submit any evidence that the physical improvements did not occur or that Lot 204 was not among those developed or improved in 2002. In responding to a motion for summary disposition, "[t]he nonmoving party must present more than mere allegations to establish a genuine issue of material fact for

resolution at trial." *Civic Ass'n of Hammond Lake v Hammond Lake Estates No 3 Lots 126-135*, 271 Mich App 130, 132 n 1; 721 NW2d 801 (2006). Because AmTrust failed to present evidence to counter Jeddo and Stock's showing that actual physical improvements were made to the disputed property, it failed to raise a genuine issue of material fact on this issue.

AmTrust argues that, if there were actual physical improvements to the property before AmTrust recorded its mortgage on March 25, 2005, those improvements were part of a different "project," owned and managed by different entities, and Jeddo's and Stock's liens cannot relate back to the work performed in 2002. We hold that, notwithstanding the change in ownership of the property, the actual physical improvements made in 2002 were related to the same project for which Jeddo and Stock provided labor and materials in 2006. Jeddo and Stock presented evidence that a large parcel of property was purchased by The Kelly Group in 1997, which was a name under which Fountain Homes, a company owned by Jeffrey and Rodney Walker, was doing business. The property includes the disputed land in Phase 3 of the Cambridge Meadows subdivision, as well as land encompassing other phases of the subdivision development project. Cambridge Investment Group, incorporated by Jeffrey Walker, later acquired the property. The permits for grading, paving, and utility work in 2002 were issued to Cambridge Investment Group, The Kelly Group, and King/Inkster I, LLC (of which Rodney Walker was resident agent)[2], and they all referred to the same project, the development of

---

[2] We take judicial notice of Rodney Walker's position as resident agent of King/Inkster I, LLC, on the basis of information contained in the Corporation Division Business Entity section of the Michigan Department of Licensing and Regulatory Affairs at <www.dleg.state.mi.us/bcs_corp/sr_corp.asp>.

Cambridge Meadows Subdivision No. 3. On August 22, 2003, Cambridge Investment Group conveyed property, including Lot 204, to Cambridge Meadows, LLC, which is wholly owned by Fountain Homes (Jeffrey and Rodney Walker), the original purchaser of the property. Thus, the evidence submitted to the trial court shows that, throughout the years, the owners and developers of the project were related entities with at least partial common ownership.

Further, Jeddo and Stock presented evidence showing that the project for which they provided labor and materials had remained the same since 2002, and AmTrust failed to present evidence in response. Jeddo and Stock submitted appraisal documents that clearly show that Cambridge Meadows subdivision was intended to be a residential development, divided into phases, from a time long before the first actual physical improvements were made in Phase 3. The documents also reflect that the clearing, grading, paving, and installation of underground utilities were all related to developing Phase 3 into residential lots within a platted subdivision for the construction of single-family homes. The labor and materials Jeddo and Stock provided for Lot 204 were a continuation of the development project. Moreover, AmTrust presented no evidence to establish a genuine issue of material fact that Jeddo and Stock provided labor and materials for a different project than was underway when the first actual physical improvements were made.

The Court in *Marinich* ruled that a change in the construction plans or construction contracts does not establish the existence of a new project if the work that is subject to the lien was part of a single project. *Marinich*, 193 Mich App at 455-458. We hold that the same rule obtains when the first actual physical im-

provement is made under the direction of a different developer if, as here, the work was performed as part of a single project. With regard to ownership of the property, we find nothing in the CLA to suggest that a change in ownership of the property to indisputably related companies continuing the same development project should alter the priority of a contractor's lien.

MCL 570.1106(2) provides that a "project" is "the aggregate of improvements contracted for by the contracting owner." This subsection does not indicate that the protections afforded by the CLA fail to apply when there is more than one owner or a change in ownership. Moreover, the CLA makes it clear that a change in ownership does not alter the validity of a lien, MCL 570.1107(3); a construction lien has priority over not only other mortgages and encumbrances, but over all other interests that may attach when the other interests are recorded after the first actual physical improvement, MCL 570.1119(3); and nothing in the CLA suggests that a transfer of ownership like the one that occurred here should alter priority. Here, evidence showed that this was not only a continuous development project, but the mortgage lender, then known as Ohio State Bank, was aware of the ownership interests in the property and the common interests of Jeffrey and Rodney Walker in those entities at least as early as 2003, long before it entered into the mortgage agreement. Construing the CLA liberally, as required by MCL 570.1302(1), and regardless of whether the property was owned or developed by other related entities, Jeddo and Stock's evidence established that the project was conceived as a whole and the development continued as planned from the time of the first actual physical improvements through the time when Jeddo and Stock provided labor and materials for Lot 204. Further, to the extent AmTrust suggests that a gap in time be-

tween the first actual physical improvements and the work performed by the lienholders should cut off the lienholders' priority, there is no requirement in the CLA that the construction commence in a timely progression. As our Supreme Court noted in *Williams & Works, Inc v Springfield Corp*, 408 Mich 732, 743; 293 NW2d 304 (1980), "mechanics' liens related back [to the commencement date], even if other contractors started their work weeks or months later."

AmTrust contends that affording priority to the construction liens in this case would make it impossible for lenders to assert priority over construction liens if prior work on the property had occurred. This Court addressed a similar argument in *Marinich*, 193 Mich App at 458-459:

> Defendant has also suggested that the trial court's interpretation of the Construction Lien Act will have a chilling effect on the construction finance industry because lenders would not risk subordinating their mortgage interests to lien claimants who are not known at the time a loan is made but are able to relate their liens back to the date of the first actual physical improvement on the project. While we agree with defendant that there is a potential risk for lenders contemplating the financing of construction projects, there is an adequate remedy afforded such lenders by the Construction Lien Act, MCL 570.1119(4), which provides for the recording of the mortgage interest before the first actual physical improvement is made. In addition, advances made by mortgage lenders after the first actual physical improvement is made may still enjoy priority over construction liens under MCL 570.1119(4) if the mortgagee has received a sworn statement from the contractor pursuant to MCL 570.1110. [Citations omitted.]

We further observe that when, as here, there is a major, multiphase subdivision project in which the land is cleared and prepped and phases and lots have been fully developed over several years, a lender has ample, visible

notice that its mortgage interest may be subject to the priority of liens filed by trades working on the development.

Because the first actual physical improvement on the project occurred before AmTrust recorded its mortgage in 2005, the liens recorded by Jeddo and Stock have priority over the mortgage. MCL 570.1119(3).

B. STOCK'S AMENDED LIENS

AmTrust contends that Stock failed to timely file its complaint seeking to foreclose on its liens. The record reflects that Stock recorded a lien on April 12, 2006, for $4,449.61, and it listed February 23, 2006 as the last day Stock provided materials for the Lot 204 project. Stock filed an "amended" claim of lien on August 22, 2006, for $26,455.68, which includes the prior lien amount and further unpaid amounts. Stock stated that the last day it furnished materials for the Lot 204 project was June 13, 2006. On January 24, 2007, Stock filed a "second amended" claim of lien for $28,651.60, which also included the prior balance owed on the project and listed the last day Stock furnished materials for Lot 204 as November 9, 2006. Finally, Stock filed its "third amended" claim of lien on July 3, 2007, for $35,997.48 with the last date it furnished materials listed as April 27, 2007. Each lien listed the first day Stock furnished materials as February 3, 2006. AmTrust contends that Stock is not entitled to foreclose on the first three liens because, contrary to MCL 570.1117(1), Stock filed this action in May 2008, more than one year after those liens were recorded. AmTrust further claims that Stock cannot recover the amounts accumulated from the initial lien to the "third amended" lien because, pursuant to MCL 570.1111(1), the "third amended" lien only

covers work performed within the previous 90 days. MCL 570.1111(1) provides, in part:

> [T]he right of a contractor, subcontractor, laborer, or supplier to a construction lien created by this act shall cease to exist unless, within 90 days after the lien claimant's last furnishing of labor or material for the improvement, pursuant to the lien claimant's contract, a claim of lien is recorded in the office of the register of deeds for each county where the real property to which the improvement was made is located.

And pursuant to MCL 570.1117(1), "[p]roceedings for the enforcement of a construction lien and the foreclosure of any interests subject to the construction lien shall not be brought later than 1 year after the date the claim of lien was recorded."

We hold that, under the circumstances of this case, Stock's "third amended" lien covered work performed from the time Stock first provided materials for construction on Lot 204 on February 3, 2006, until the last date Stock provided materials for construction on Lot 204 on April 27, 2007. As discussed, we must construe the CLA liberally "to secure the beneficial results, intents, and purposes of this act." MCL 570.1302(1). One of those purposes is "to protect the right of lien claimants to payment for wages or materials . . . ." *Marinich*, 193 Mich App at 453. It is clear that all of Stock's liens relate to materials it provided for a single portion of the development project—the construction of the residential structure on Lot 204. Because of various delays in construction, Stock found it necessary to protect its right to payment by filing liens during the gaps in work in the event the development project completely ceased. MCL 570.1111(1) required Stock to record its lien within 90 days of the last furnishing of material for the improvement or risk losing the protec-

tions under the CLA. Thus, it was logical for Stock to record its liens as time elapsed between deliveries when progress on construction was erratic. However, there is no dispute that, with respect to the Lot 204 project, Stock's final provision of materials was on April 27, 2007. Stock did not lose its ability to protect its right to payment for all materials supplied for the project by recording the prior liens when the final "third amended" lien clearly states that Stock's first provision of materials for the Lot 204 project was on February 3, 2006, and its final provision of materials for the Lot 204 project was on April 27, 2007. Under the CLA, Stock's "third amended" lien is valid, and Stock timely filed this action within one year of the date the lien was recorded.

Affirmed.

WILDER, P.J., and DONOFRIO, J., concurred with SAAD, J.