*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MORLAND PROPERTY SERVICES, LLC,

       Plaintiff-Appellant,

v

J. J. DEVELOPMENT, INC., THE MARNEY
GROUP, INC., and JOSEPH TRUPIANO, JR.,

       Defendants-Appellees.

UNPUBLISHED
January 11, 2024

No. 363581
Oakland Circuit Court
LC No. 2021-186349-CB

Before: GLEICHER, P.J., and BORRELLO and SHAPIRO, JJ.

PER CURIAM.

In this case involving the Construction Lien Act (CLA), MCL 570.1101 *et seq*., and the Michigan Uniform Voidable Transactions Act (MUVTA), MCL 566.31 *et seq*., plaintiff appeals as of right the trial court's order granting summary disposition of plaintiff's lien-foreclosure and fraudulent-conveyance claims in favor of defendants under MCR 2.116(C)(10) (no genuine issue of any material fact). For the reasons set forth in this opinion, we reverse and remand for further proceedings.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

William Wesley Morland ("Morland") was the sole member of plaintiff, an LLC licensed to do business in Michigan. Defendant, Joseph Trupiano, Jr., owned and operated defendants, J. J. Development, Inc. (JJDI), and the Marney Group, Inc. On March 20, 2017, Morland and JJDI entered into a contract that would eventually result in the present litigation. JJDI promised to "purchase and develop the south hill property in Milford," Michigan, which consisted of six lots. Under the terms of the contract, Morland agreed to "coordinate and supervise all aspects of the development and construction of roadway, septic systems[,] spec homes[,] etc.[,] along with the assistance of" Trupiano, Jr.'s son, Joseph Trupiano III. JJDI would finance the operation, paying Morland for the work performed, while expecting interest on the money loaned. Morland would receive two of the lots, which JJDI would choose, at cost plus $25,000. The contract also required two "spec homes" to be built on Lots 4 and 5 of the South Hill property. Trupiano, Jr., testified

the lots Morland was to receive under the contract were never identified by JJDI. The parties referred to the subdivision project as the "South Hill Project," or "Montclair Estates."

The contract refers to Morland in his individual capacity, not plaintiff. Defendants, however, have not disputed JJDI had a contractual relationship with plaintiff as well as Morland. Instead, the record suggests the contract between JJDI and plaintiff was oral instead of written. Additionally, there appears to be little dispute the contract with plaintiff required it to perform improvements to Lot 5 (the subject property). As construction on the various lots continued, the relationship between plaintiff and JJDI began to sour. Morland became concerned plaintiff would not be paid for the work performed on the subject property. On February 12, 2020, plaintiff filed a construction lien for $125,000, listing January 21, 2020, as the last day it provided labor or materials to the subject property.

On April 29, 2020, JJDI sent a cease-and-desist letter to plaintiff and Morland, demanding they stop working on Montclair Estates or face a claim of trespassing. On May 1, 2020, JJDI conveyed the subject property via quitclaim deed to the Marney Group for $1. Twenty days later, on May 21, 2020, plaintiff filed an amended construction lien for over $2 million, listing April 29, 2020, as the last day it provided labor or materials to the subject property. In June 2020, litigation between the parties commenced in Livingston County. While that litigation progressed, plaintiff filed the instant lawsuit in February 2021. Plaintiff's two-count complaint requested foreclosure on the construction lien under the CLA and to set aside the conveyance of the subject property from JJDI to the Marney Group under the MUVTA. In May 2021, the Marney Group conveyed the subject property via quitclaim deed to "Joseph Trupiano." The deed did not indicate whether Trupiano, Jr., or Trupiano III was the owner, and did not list a sale price. The second conveyance was not recorded until September 2021.

After discovery, defendants moved for summary disposition under MCR 2.116(C)(10). Pertinently, defendants argued plaintiff's construction lien was not timely under MCL 570.1111(1), because plaintiff had not furnished labor or services with respect to the subject property in the 90 days preceding the filing of the initial construction lien. Defendants relied heavily on the deposition testimony of Morland, who stated he had not been employed since 2019. Defendants also claimed the construction lien was invalid because it was not on the basis of a written contract, which was required for improvements to residential structures under the CLA. As for plaintiff's fraudulent-conveyance claim, defendants contended there was insufficient evidence of JJDI having a fraudulent intent when it transferred the subject property to the Marney Group. Instead, defendants insisted JJDI conveyed the subject property to the Marney Group for tax purposes after a recommendation from JJDI's accountant.

Plaintiff responded by arguing Morland continued to work on the subject property until April 29, 2020, when he received the cease-and-desist letter. Plaintiff asserted Morland misspoke during his deposition, which he explained in an affidavit prepared after the fact. As to defendants' other argument, plaintiff claimed the contract between it and JJDI did not have to be in writing because the structure being built on the subject property did not fit the CLA definition of a residential structure. Regarding its fraudulent-conveyance claim, plaintiff posited there was adequate proof of fraudulent intent considering evidence supported the existence of several "badges of fraud" listed in MCL 566.34(2). In reply, defendants asserted plaintiff could not rely on Morland's self-serving affidavit to cure his damaging deposition testimony, the structure

actually was residential under the specific language of the statute, and plaintiff's reliance on the badges of fraud was misplaced. After two separate sessions of oral arguments, the trial court issued a written opinion and order granting summary disposition in favor of defendants with respect to both of plaintiff's claims. The trial court stated the lien was untimely under the CLA and did not explain its reasoning under the MUVTA. This appeal followed.

## II. CONSTRUCTION LIEN

Plaintiff argues the trial court improperly granted summary disposition of the lien-foreclosure claim in favor of defendants because there was a genuine issue of material fact regarding when plaintiff last performed work on the subject property. We agree.[1]

## A. TIMELINESS OF CONSTRUCTION LIEN

Plaintiff brought the present litigation under the CLA. "The CLA is intended to protect the interests of contractors, workers, and suppliers through construction liens, while protecting owners from excessive costs." *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016) (quotation marks and citation omitted). "As set forth in the [CLA], 'Each contractor, subcontractor, supplier, or laborer who provides an improvement to real property has a construction lien upon the interest of the owner or lessee who contracted for the improvement to the real property.' " *TSP Servs, Inc v Nat'l-Std, LLC*, 329 Mich App 615, 621; 944 NW2d 148 (2019), quoting MCL 570.1107(1). In other words, "[a] construction lien is a security interest that a participant on a construction project takes in real property as security for their payment expectations." *Legacy Custom Builders, Inc v Rogers*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359213); slip op at 4.

"Construction liens have two periods of limitations: a threshold period of limitations for recording the lien, and a period for filing suit to foreclose the lien." *Id*. at ___; slip op at 6. Only the former is relevant in the present case. Under MCL 570.1111(1),

---

[1] We review de novo a trial court's decision on a motion for summary disposition. See *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). Motions for summary disposition under MCR 2.116(C)(10) test "the factual sufficiency of a claim." *Id.* "When reviewing such a motion, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion." *Id.* (quotation marks and citation omitted). "A genuine issue of material fact exists when the record 'leave[s] open an issue upon which reasonable minds might differ.' " *Id.* (citation omitted). These issues involve statutory interpretation, which we review de novo. See *Saugatuck Dunes Coastal Alliance v Saugatuck Twp*, 509 Mich 561, 577; 983 NW2d 798 (2022). "When construing a statute, this Court's primary goal is to give effect to the intent of the Legislature." *Rowland v Washtenaw County Rd Comm'n*, 477 Mich 197, 202; 731 NW2d 41 (2007). When statutory language is unambiguous, courts apply the statute as written. *Id*.

the right of a contractor, subcontractor, laborer, or supplier to a construction lien created by this act shall cease to exist unless, within 90 days after the lien claimant's last furnishing of labor or material for the improvement, pursuant to the lien claimant's contract, a claim of lien is recorded in the office of the register of deeds for each county where the real property to which the improvement was made is located.

When considering the statutory language above, this Court stated: "[A] claimant must file its lien no later than 90 days from the last date of furnishing labor or material, pursuant to the lien claimant's contract." *CD Barnes Assocs, Inc v Star Heaven, LLC*, 300 Mich App 389, 419; 834 NW2d 878 (2013) (emphasis omitted). The 90-day deadline is a strict one; an exception for substantial compliance does not apply to it. *Northern Concrete Pipe, Inc v Sinacola Cos-Midwest, Inc*, 461 Mich 316, 323; 603 NW2d 257 (1999).

Plaintiff filed the original construction lien on February 12, 2020. The parties agree that, under MCL 570.1111(1), 90 days before February 12, 2020, is November 14, 2019. Therefore, the parties also agree plaintiff had to "furnish[] labor or material for the improvement," on or after November 14, 2019, for the construction lien to be timely. *Id*.[2] The trial court and defendants focus their attention on the following testimony by Morland during his deposition:

> *Q*. So, sir, I asked you, and I didn't hear the answer, do you have any licenses?
>
> *A*. No.
>
> *Q*. And when did you let your builder's license expire?
>
> *A*. I believe it would be 2019.
>
> *Q*. Okay. All right. When's the last time you were employed?
>
> *A*. 2019.

---

[2] On appeal, plaintiff contends the relevant date requirements were altered, or "reset," by plaintiff's filing of the amended construction lien on May 21, 2020. We presume that plaintiff is alternatively contending that the last day of labor or materials needed to be within 90 days before May 21, 2020. However, if plaintiff did not provide labor or materials on or after November 14, 2019, as defendants contend, then plaintiff would also not meet the alternative date, *unless* there was a work stoppage that ran from before November 14, 2019 until sometime in February 2020. This Court has recognized the validity of cumulative amended liens filed when there are "gaps in work." See *Jeddo Drywall, Inc v Cambridge Inv Group, Inc*, 293 Mich App 446, 460-461; 810 NW2d 633 (2011). Because plaintiff does not expressly argue that there was a work stoppage, however, we decline to address this alternative argument.

*Q*. Where were you employed?

*A*. [Plaintiff].

In addition to this testimony, defendants also supplied the trial court with 10 affidavits from business owners who performed work on the subject property and did not see Morland or any other representative of plaintiff on the subject property after mid-October 2019.

Plaintiff asserted Morland misspoke because he became confused about when his builder's license expired, thinking it was in 2019. Morland associated the end of his employment with the expiration of his builder's license. Therefore, the confusion about the builder's license seeped into the answer about the end of his employment. After the deposition, Morland completed an affidavit in which he explained his confusion and averred he actually performed work on the property until April 2020 and that his builder's license did not expire until May 2020. The trial court refused to credit the affidavit, noting caselaw did not permit plaintiff to cure damaging deposition testimony with an affidavit. The trial court is correct, to an extent. "It is well established that a party or witness may not manufacture a question of material fact by directly contradicting the person's own deposition testimony with an affidavit." *Bakeman v Citizens Ins Co of the Midwest*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357195); slip op at 5. However, "a party may provide an affidavit to explain, clarify, or expand upon deposition testimony, especially where the deposition testimony was not unequivocal." *Id*.

Arguably, Morland's affidavit did not directly contradict his deposition testimony. Morland was not asked in the relevant deposition exchange when he last worked on the subject property. Rather, the questions related to the expiration of his builder's license and his last date of employment. Although the inference is that Morland would not have performed worked on the subject property after that date, his testimony was not unequivocal on that matter. Further, defendants do not dispute Morland's assertion that his builder's license expired in May 2020.

In any event, even ruling out the affidavit filed by Morland after his deposition, the documentary evidence provided to the trial court still established a question of fact related to whether plaintiff provided work or materials for the subject property after November 14, 2019. Most relevant, the original construction lien plainly states: "The last day of providing the labor and/or material was the 11th day of January 2020." (Bolding omitted). The document was signed by Michele McKinney, an agent of plaintiff. The original lien was notarized, explaining it was "[s]ubscribed and sworn to before" the notary public "by Michele McKinney," on February 11, 2020. The amended construction lien claimed plaintiff's provision of work and materials for the subject property continued until April 29, 2020. Like the original lien, the amended lien was subscribed and sworn to a notary, and signed by McKinney as plaintiff's agent.

Additional evidence supports plaintiff's claim regarding the last day it furnished labor and materials for the property. For example, Morland and Trupiano, Jr., as representatives of plaintiff and JJDI, respectively, met in February 2020, to discuss a path forward as their business relationship began to sour. In a document created after the meeting, plaintiff's continuing work on the subject property is specifically referenced. The document, which is signed by both parties, states "[JJDI] will work with [plaintiff] and the [homeowners of Lot 3] to finalize a plan to complete of [sic] Lot 3 and [the subject property]." The document also discussed the money

already spent on the subject property, plans to have custom cabinets delivered to the site, and that a finalized agreement about completing the work on the subject property would not be entered until Morland discharged a lien he apparently had on Lot 4 of the South Hill property. Given this agreement between the parties, it is clear JJDI was still at least contemplating allowing plaintiff and Morland to continue working on the subject property, and it permits an inference that plaintiff was still working on the subject property since, if plaintiff had not performed any work on the subject property in about four months, as alleged by defendants, it seems unlikely JJDI would be negotiating for plaintiff to finish the job. Lastly, seeing as plaintiff was considering a continuation of work on the subject property, he must have still had his builder's license. The meeting took place in February 2020, which meant there was record support other than Morland's affidavit that in his deposition he misspoke about having ended his employment in 2019.

By relying solely on Morland's deposition testimony without considering other evidence, the trial court erred. It was required to consider the evidence "in the light most favorable to the party opposing the motion," which was plaintiff. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Further, "[t]he trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10)." *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). If the trial court had construed the evidence in a light most favorable to plaintiff, it would have recognized the two construction liens and the February 2020 meeting notes indicated plaintiff continued to furnish services and materials to the subject property well after November 14, 2019. Moreover, it is not clear why the trial court believed Morland's testimony was conclusive of the issue in this case. If Morland actually did stop working in 2019, but it was while performing services on the subject property on November 15, 2019, the construction lien still would have been timely. The trial court failed to recognize the record lacked any indication of when, precisely, during 2019, Morland stopped working.

In sum, there was a genuine issue of material fact regarding whether plaintiff's construction lien was timely under MCL 570.1111(1), and summary disposition was improper on this ground.

## B. RESIDENTIAL STRUCTURE

Defendants argue we should nonetheless affirm the trial court on alternative grounds. Specifically, defendants contend plaintiff's liens were unenforceable because they were not founded on a written contract for the services and materials provided to JJDI for the subject property. As noted, " '[e]ach contractor, subcontractor, supplier, or laborer who provides an improvement to real property has a construction lien upon the interest of the owner or lessee who contracted for the improvement to the real property.' " *TSP Servs, Inc*, 329 Mich App at 621, quoting MCL 570.1107(1). The statutory language references that the work be "contracted for" to support a construction lien. *Id*. Generally, the CLA defines "contract" as "a contract, of whatever nature, for the providing of improvements to real property, including any and all additions to, deletions from, and amendments to the contract." MCL 570.1103(4). In other words, the CLA typically is not concerned with the form of the contract. *Id*. However, when dealing with residential structures, a special provision exists:

A contractor does not have a right to a construction lien on the interest of an owner or lessee in a residential structure unless the contractor has provided an improvement to the residential structure under a written contract between the owner or lessee and the contractor and any amendments or additions to the contract are also in writing. [MCL 570.1114.]

The statute also provides a list of required clauses in any written contract under MCL 570.1114.

It is undisputed that there is not a written contract between plaintiff and JJDI that would satisfy the requirements of MCL 570.1114. Accordingly, this issue turns on whether the structure being built on the subject property is a "residential structure" as referenced in MCL 570.1114, so as to require a written contract. The CLA defines "residential structure" as:

"Residential structure" means an individual residential condominium unit or a residential building containing not more than 2 residential units, the land on which it is or will be located, and all appurtenances, in which the owner or lessee contracting for the improvement is residing or will reside on completion of the improvement. [MCL 570.1106(4).]

The parties do not appear to dispute the home being built on the subject property was a "residential building." *Id*. However, they do dispute whether "the owner or lessee contracting for the improvement is residing or will reside [in the structure] on completion of the improvement." *Id*. Defendants argue Morland should be considered a lessee who planned to reside on the subject property after the completion of construction, making it a residential structure under MCL 570.1106(4). However, this argument ignores a distinct part of the language in MCL 570.1106(4). Specifically, the person planning to live in the subject property must be "the owner *or lessee contracting for the improvement . . . .*" *Id*. (emphasis added). In other words, the CLA only defines a structure as residential when the person contracting for the improvement, whether it be a lessee or owner of the subject property, lives there or plans to move in once construction is done. *Id*. As a result, even if Morland could be considered a lessee,[3] he did not *contract for* the improvement of the subject property. Therefore, the statutory definition of a residential structure was not met. Instead, Morland was *contracted to* complete the improvements. In fact, the only

---

[3] As recognized by plaintiff, the CLA defines "lessee" as "a person, other than the owner, who holds an interest, other than a security interest, in real property." MCL 570.1105(1). The only evidence of Morland's "interest" in the subject property, other than the security interest sought by plaintiff, was his self-expressed desire to eventually live in the home built on the subject property. Simply put, such was not a sufficient interest to cause Morland to be a lessee as intended in MCL 570.1106(4). This argument, then, is another reason the contract between plaintiff and JJDI did not have to be in writing under MCL 570.1114.

Further, because Morland was not a lessee and did not contract for the improvements, this case is distinguishable from *Kitchen Suppliers, Inc v Erb Lumber Co*, 176 Mich App 602; 440 NW2d 50 (1989) (holding that a third party who contracted with the building company to have the home built for them was a lessee as defined by the CLA, such that the home was a residential structure under the CLA).

"owner" or "lessee" who contracted *for* an improvement on the subject property, on the record provided to us on appeal, was JJDI. Plainly, there was no evidence JJDI, a corporation, planned to reside in the home eventually built on the subject property. Thus, under MCL 570.1106(4), the structure at issue in the present case was not a residential one, and therefore, the contract forming the basis of the construction lien was not required to be in writing under MCL 570.1114.

To summarize, the trial court improperly decided there was no question of fact whether plaintiff furnished services or materials to the subject property after November 14, 2019, and the record showed the contract between plaintiff and JJDI did not have to be in writing to validate the construction lien. As a result, the trial court erred when it granted summary disposition in favor of defendants with respect to plaintiff's lien-foreclosure claim.

## III. FRAUDULENT CONVEYANCE

Plaintiff also argues the trial court improperly granted summary disposition of the fraudulent-conveyance claim because there was an issue of fact related to fraudulent intent. We agree.

As an initial matter, we note that the trial court's reason for dismissing the fraudulent-conveyance claim is not clear from the lower court record. The trial court stated in its opinion granting summary disposition of the lien claim that it had granted summary disposition of the MUVTA claim at the August 16, 2022 hearing, but no such decision exists in the transcript, leaving us without a clear understanding of the reasons behind the trial court's decision.

Plaintiff brought its claim under the MUVTA to set aside the conveyance of the subject property from JJDI to the Marney Group. The MUVTA was "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." *Dillard v Schlussel*, 308 Mich App 429, 446; 865 NW2d 648 (2014) (quotation marks and citation omitted).[4] We first consider defendants' argument that plaintiff's claim under the MUVTA must fail because plaintiff was not a creditor of JJDI. Defendants are correct that only a creditor is entitled to relief under the MUVTA, considering the statute states "a transfer made or obligation incurred by a debtor is voidable *as to a creditor*," under specific circumstances. MCL 566.34(1) (emphasis added). " 'Creditor' means a person that has a claim." MCL 566.31(d). " 'Claim', except as used in 'claim for relief', means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." MCL 566.31(c).

Defendants' argument is plaintiff is not a "creditor" under the MUVTA because plaintiff does not have a "claim" against JJDI. This argument presupposes defendants' success on the first issue addressed in this case, which was whether the trial court properly determined plaintiff's construction lien was invalid. In other words, defendants contend, absent a valid construction lien, plaintiff has no claim under the MUVTA, and therefore was not a creditor. The trial court implied it believed this argument by questioning plaintiff during the summary-disposition hearing about

---

[4] This case references the Uniform Fraudulent Transfers Act, which was the name used for the statutory scheme before a 2016 amendment, MCL 566.45(1).

whether its fraudulent-transfer claim necessarily would fail if its lien-foreclosure claim also failed. But, as discussed above, there was a question of fact regarding whether plaintiff's construction lien was valid, which also means there is a question of fact about whether plaintiff has a "claim" against JJDI. MCL 566.31(c).

Moreover, plaintiff would have a claim even if we upheld the trial court's determination that the construction lien was invalid. Defendants argue plaintiff had no claim against JJDI because the Livingston County lawsuit had not resulted in a judgment in plaintiff's favor. However, the definition of "claim" in the MUVTA specifically states a claim does not need to be reduced to a judgment. *Id.* (defining "claim" as "a right to payment, whether or not the right is reduced to judgment"). Further, the record shows JJDI has specifically acknowledged it had a contract with plaintiff, but there was a dispute about the extent of the contract and what plaintiff was owed from JJDI. Even so, the MUVTA is also clear that a "claim" still exists when the right to payment is "disputed" or "undisputed." *Id.* Accordingly, the dispute still taking place in Livingston County about plaintiff's right to payment under the contract with JJDI is not a sufficient reason to determine plaintiff does not have a claim under the MUVTA. *Id.* Further, because plaintiff has a claim against JJDI, plaintiff is a creditor of JJDI. MCL 566.31(d). As a result, this argument by defendants lacks merit.

Turning to the merits, the MUVTA "defines two species of fraudulent transfers," *Dillard*, 308 Mich App at 446, citing MCL 566.34(1)(a) and MCL 566.35(1). The first of these "species" involves "transfers made '[w]ith actual intent to hinder, delay, or defraud' a creditor and applies to transfers made either before or after the creditor's claim arose." *Dillard*, 308 Mich App at 446, quoting MCL 566.34(1)(a). The relevant provision of the MUVTA states:

> (1) Except as otherwise provided in subsection (4),[5] a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following circumstances:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
>
> (*i*) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (*ii*) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. [MCL 566.34(1).]

---

[5] This citation is to MCL 566.34(4), which does not apply in this case.

The parties focus their arguments on subsection (1)(a) by disputing whether plaintiff presented sufficient evidence to prove JJDI had the "actual intent to hinder, delay, or defraud" plaintiff. *Id*. "Under the framework set forth in MCL 566.34(1)(a), the debtor's state of mind in making a transfer determines whether a transfer qualifies as made with an actually fraudulent intent." *Dillard*, 308 Mich App at 448. However, the Legislature was cognizant of the fact that "debtors rarely admit to having deliberately placed assets out of the reach of their creditors." *Id*. at 448-449. To assist in proving such intent, then, the Legislature included in the MUVTA a provision setting "forth a nonexclusive list of 11 factors that may be considered in determining a debtor's actual intent in making a transfer[.]" *Dillard*, 308 Mich App at 449. These factors are commonly referred to as "badges of fraud." *Id*. The relevant statutory provision, MCL 566.34(2), states:

> (2) In determining actual intent under subsection (1)(a) or (4), consideration may be given, among other factors, to whether 1 or more of the following occurred:
>
> (a) The transfer or obligation was to an insider.
>
> (b) The debtor retained possession or control of the property transferred after the transfer.
>
> (c) The transfer or obligation was disclosed or concealed.
>
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (e) The transfer was of substantially all of the debtor's assets.
>
> (f) The debtor absconded.
>
> (g) The debtor removed or concealed assets.
>
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
>
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
>
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
>
> (k) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Defendant maintains that plaintiff failed to present sufficient evidence of fraudulent intent to survive summary disposition. In *Dillard*, 308 Mich App at 454, this Court stated that, "once a creditor establishes the presence of multiple badges of fraud, he or she has established a fact question regarding actual intent."

-10-

"Factor (a) supports an inference of fraudulent intent when a transfer is made to an insider." *Id*. at 450, citing MCL 566.34(2)(a). Under the MUVTA, an "insider" includes "[a]n affiliate, or an insider of an affiliate as if the affiliate were the debtor." MCL 566.31(i)(*iv*). An "affiliate," meanwhile, includes a

> corporation 20% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by the debtor or a person that directly or indirectly owns, controls, or holds, with power to vote, 20% or more of the outstanding voting securities of the debtor . . . . [MCL 566.31(a)(*ii*).]

Here, the transfer was from JJDI to the Marney Group. Trupiano, Jr., testified he owned and operated both companies. Thus, the transfer was to the Marney Group, which is a "corporation 20% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by" Trupiano, Jr. *Id*. Further, Trupiano, Jr., is a "person that directly or indirectly owns, controls, or holds, with power to vote, 20% or more of the outstanding voting securities of" JJDI, which is the debtor. *Id*. By definition, the Marney Group was an "affiliate" of JJDI under MCL 566.31(a)(*ii*) and the Marney Group was an "insider" of JJDI for purposes of MCL 566.31(i)(*iv*). Therefore, the first badge of fraud is supported by record evidence. MCL 566.34(2)(a).

"Factor (b) is satisfied by evidence that '[t]he debtor retained possession or control of the property transferred after the transfer.'" *Dillard*, 308 Mich App at 451, quoting MCL 566.34(2)(b). " 'No effort to hinder or delay creditors is more severely condemned by the law than an attempt by a debtor to place his property where he can still enjoy it and at the same time require his creditors to remain unsatisfied.' " *Dillard*, 308 Mich App at 451, quoting *Bentley v Caille*, 289 Mich 74, 78; 286 NW 163 (1939). As discussed, the subject property was transferred from the debtor in this case, JJDI, to the Marney Group. While JJDI does not have a controlling interest in the Marney Group, the connection between the two companies is evidenced by the fact that both companies are owned and operated by one person, Trupiano, Jr.[6] Thus, because Trupiano, Jr., controls JJDI and the Marney Group, JJDI effectively still retained control over the subject property when it was transferred to the Marney Group. Importantly, the only relevant person with interest in JJDI—Trupiano, Jr.—retained control over the subject property after it was transferred as a result of his control over the transferee, the Marney Group. As a result, there is proof to support this second badge of fraud. MCL 566.34(2)(b).

"The third factor, MCL 566.34(2)(c), applies when '[t]he transfer was . . . concealed.' " *Dillard*, 308 Mich App at 451. In support of this badge of fraud, plaintiff argues the transfer was concealed because Trupiano, Jr., did not immediately record the conveyance from the Marney Group to "Joseph Trupiano." However, plaintiff is challenging the first conveyance, from JJDI to the Marney Group, not the second conveyance. The quitclaim deed issued by JJDI to the Marney Group was recorded the day after it was signed. At that point, the conveyance was public record, of which plaintiff became aware, at the latest, when it filed its amended construction lien about 20

---

[6] Although Trupiano, Jr., testified his wife had an ownership interest in both companies, it seems clear in the record that he controlled both companies himself.

days after the conveyance. There is no record evidence to support JJDI concealed its transfer of the property to the Marney Group. MCL 566.34(2)(c).

The fourth badge of fraud requires consideration of whether, "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." MCL 566.34(2)(d). The conveyance in this case occurred on May 1, 2020. Litigation between plaintiff and JJDI commenced in Livingston County on June 6, 2020. Therefore, it is clear litigation had not begun when the transfer occurred. Nevertheless, the record plainly shows litigation was anticipated at the time of the conveyance. First, plaintiff recorded its construction lien on the subject property on February 12, 2020, which preceded the conveyance. Second, representatives of plaintiff and JJDI met on February 19, 2020, to discuss the various issues between the parties, including disputes regarding amounts owed between them. While the memorandum issued after the meeting provided a potential path forward for plaintiff and JJDI, it certainly allowed for an inference that the dispute between the parties was beginning to boil over. Third, JJDI sent plaintiff and Morland a cease-and-desist letter on April 29, 2020, in which JJDI threatened to sue if plaintiff and Morland continued to work on the subject property. Indeed, it was only two days after the cease-and-desist letter was sent when JJDI conveyed the subject property to the Marney Group. On the basis of all of this evidence, circumstantial though it may be, it is at least a reasonable inference that JJDI feared litigation from plaintiff when JJDI decided to transfer the subject property to the Marney Group. Accordingly, there is at least a question of fact about whether this badge of fraud was present. MCL 566.34(2)(d).

The next three badges of fraud, MCL 566.34(2)(e), (f), and (g), are not supported by proof on the record. As for (e), plaintiff asserts it is possible the subject property was "substantially all of the debtor's assets," but does not direct our attention to any proof of such in the record. As for MCL 566.34(2)(f) and (g), there was no indication on the record that "[t]he debtor absconded," or "[t]he debtor removed or concealed assets," other than the subject property at issue in the present case.

The parties disagree about MCL 566.34(2)(h), which states: "The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." In *Dillard*, 308 Mich App at 452-453, this Court concluded factor (h) weighed in favor of fraudulent intent when the debtor "received no value for transferring" the assets to a new owner. Here, the Marney Group paid only $1 to JJDI for the subject property, which meant it obtained the property for what was effectively no value. Therefore, this badge of fraud weighs in favor of fraudulent intent by JJDI. MCL 566.34(2)(h); *Dillard*, 308 Mich App at 452-453.

As to factor (*i*), which questions whether the debtor was insolvent or became insolvent by transferring the asset, there was no evidence in the record of JJDI's solvency. MCL 566.34(2)(*i*). While plaintiff speculates about the potential financial state of JJDI, there is no record evidence on that matter. Accordingly, this badge is inapplicable.

With respect to factor (j), which requires consideration of whether the transfer occurred "shortly before or shortly after a substantial debt was incurred," MCL 566.34(2)(j), it is important to note the timing of the transfer. Here, plaintiff and JJDI were operating under contract for a period of several years while building up the South Hill property. The debts between JJDI and

-12-

plaintiff were relatively unclear from the record as the construction progressed. However, as of February 12, 2020, plaintiff made it abundantly clear when it filed the original construction lien that it believed it was owed at least $125,000 from JJDI. Less than three months later, and as litigation regarding the money owed became more likely, JJDI conveyed the subject property to the Marney Group on May 1, 2020. Therefore, although it is questionable when the debt was incurred for purposes of MCL 566.34(2)(j), the badge of fraud is supported by JJDI's actions occurring within three months of JJDI being put on specific notice of the relatively large debt plaintiff purported it was owed in the original construction lien.

In sum, then, there is evidentiary support for five badges of fraud, codified at MCL 566.34(2)(a), (b), (d), (h), and (j).[7] As stated by this Court, "once a creditor establishes the presence of multiple badges of fraud, he or she has established a fact question regarding actual intent." *Dillard*, 308 Mich App at 454. Defendants attempt to escape this conclusion by arguing there was no fraudulent intent because JJDI's accountant recommended the transfer for tax purposes. This argument by defendants, however, ignores another relevant holding of *Dillard*, in which this Court considered the debtor's claim there was a valid, nonfraudulent reason for the challenged transfer of assets. *Id.* This Court ruled that "by ignoring the factors supporting [the debtor]'s actual intent to fraudulently transfer his earnings and instead crediting the [the debtor and transferee's] claim that they merely intended to pay expenses rather than to hinder [the creditor]'s collection efforts, the circuit court invaded the province of the fact-finder." *Id.* In other words, the debtor's identification of a nonfraudulent reason for the transfer of assets created a factual issue for a fact-finder, not a reason to award summary disposition in the debtor's favor. *Id.* Therefore, in the present case, defendants' claim JJDI transferred the subject property solely for tax purposes as recommended by an accountant does not warrant summary disposition in defendants' favor. Instead, it has created a potential factual question for a fact-finder to decide when considering whether JJDI had fraudulent intent when conveying the subject property to the Marney Group.

In sum, because plaintiff was a creditor of JJDI and there was a factual question regarding JJDI's intent in transferring the subject property to the Marney Group, the trial court erred when it granted summary disposition of the fraudulent-conveyance claim in favor of defendants under MCR 2.116(C)(10). MCL 566.34(1)(a).

## IV. CONCLUSION

For the reasons stated above, we reverse the trial court's opinion and order granting summary disposition in favor of defendants and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro

---

[7] The final factor, MCL 566.34(2)(k), has not been argued in the present case.